# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON

FILED

July 24, 1998

Cecil Crowson, Jr.

Appellate Court Clerk

| | | |
|---|---|---|
| **THE EYE CLINIC, P.C. and its** | ) | |
| **shareholders; DR. BEN HOUSE,** | ) | |
| **DR. JIM PRICE, DR. ARTHUR** | ) | |
| **WOODS, DR. MARK BATEMAN and** | ) | |
| **DR. BRUCE HERRON,** | ) | |
| | ) | |
| Plaintiffs/Appellees, | ) | Madison Chancery No. 51932 |
| | ) | |
| **vs.** | ) | |
| | ) | Appeal No. 02A01-9707-CH-00143 |
| **JACKSON-MADISON COUNTY** | ) | |
| **GENERAL HOSPITAL, WEST** | ) | |
| **TENNESSEE HEALTHCARE, INC.,** | ) | |
| **and HEALTH PARTNERS, INC.** | ) | |
| | ) | |
| Defendants/Appellants. | ) | |

APPEAL FROM THE CHANCERY COURT OF MADISON COUNTY
AT MEMPHIS, TENNESSEE

THE HONORABLE JOE C. MORRIS, CHANCELLOR

For the Plaintiffs/Appellees:

William H. West
Nashville, Tennessee

For the Intervening Defendant/Appellant:

John Knox Walkup
Michael E. Moore
Ann Louise Vix
Nashville, Tennessee

For the Defendants/Appellants:

Gayle Malone, Jr.
Dan H. Elrod
Mary Ellen Morris
Amanda Haynes Young
Nashville, Tennessee

For the Amici Curiae, Tennessee Hospital
Association, Tennessee Public and Teaching
Hospitals, Inc. and Hospital Alliance of
Tennessee, Inc.:

William B. Hubbard
Carlos C. Smith
Mark W. Smith
Jerry W. Taylor
Nashville, Tennessee

**REVERSED AND REMANDED**

HOLLY KIRBY LILLARD, J.

CONCUR:

W. FRANK CRAWFORD, P.J., W.S.

ALAN E. HIGHERS, J.

**OPINION**

This suit involves a challenge by various eye doctors to the business activities of a public hospital district and its spin-offs. The trial court granted summary judgment to the plaintiffs after determining that the defendants' business activities violated the Tennessee Constitution. We reverse.

Defendant/Appellant Jackson-Madison County General Hospital District ("the District") is a quasi-governmental entity created by a Private Act by the Tennessee legislature. The District was created to provide health care services for area residents. The District created Defendant/Appellant Health Partners, Inc. ("Health Partners") and Defendant/Appellant West Tennessee Alliance for Healthcare, Inc. ("West Tennessee Alliance") to further its objectives. West Tennessee Alliance is a physician-hospital organization ("PHO"), created to permit hospitals and doctors to jointly obtain provider contracts with payors of health care benefits. The District owns fifty (50%) percent of West Tennessee Alliance, and the other fifty (50%) percent is owned by private physicians.

Health Partners is a preferred provider organization ("PPO"), and the District is its sole member. Health Partners contracts with health care providers to create a network to offer to customers. In addition, Health Partners contracts with third-party payors to offer health care services. In 1995, the District created another PPO called Sight Care Network ("Sight Care"). Sight Care is not an independent entity; it is a network of eye doctors created to provide services.

Plaintiff/Appellee The Eye Clinic, P.C. is a professional corporation. All of its shareholders are opthamologists and optometrists, who are also plaintiffs in this suit. All of the individual doctor plaintiffs had preferred provider agreements with Health Partners at one time, but they have since been terminated. The parties' stipluation explains the reason for the termination of the plaintiffs' agreements:

> After the effective date of those terminations, Health Providers, Inc., plans to limit its provider network in Madison County to The Jackson Clinic, P.A., the West Tennessee Alliance for Healthcare, L.L.C., and physicians practicing in specialties or subspecialties not available through either of those organizations.

None of the individual doctor plaintifs are members of the Jackson Clinic and none were invited to participate in West Tennessee Alliance or Sight Care.

The plaintiffs filed this lawsuit, alleging that Article II, §§ 29 and 31 of the Tennessee Constitution prohibit the District from jointly owning provider networks with private individuals. In addition, the plaintiffs asserted that the Tennessee Constitution prohibits the District from operating PPOs, such as Health Partners and Sight Care. The plaintiffs maintained that the District's

operation of such PPOs results in a public entity engaging in a business carried on by private enterprise and violates the constitutional provisions for due process and equal protection. The plaintiffs sought to enjoin the District from operating West Tennessee Alliance, and also sought to enjoin the defendants from engaging in any similar enterprises in the future.

The defendants filed a motion for summary judgment. The defendants argued that their actions were authorized by the Private Act Hospital Authority Act of 1996 ("Hospital Authority Act"), Tenn. Code Ann. §§ 7-57-601 et seq., and that the state constitution does not forbid their conduct. This motion was denied.

The plaintiffs filed a motion for partial summary judgment and for a preliminary and permanent injunction. The trial court issued an order mandating notification to the State Attorney General that the constitutionality of portions of the Hospital Authority Act were being challenged. Consequently, the Attorney General intervened as a defendant in this action. The defendants then filed a cross motion for partial summary judgment.

In a cursory opinion, the trial court granted summary judgment in favor of the plaintiffs, concluding that the defendants' actions violated Article II, §§ 29 and 31 of the Tennessee Constitution. The trial court found that the District "is a joint venture of the City of Jackson and Madison County." The defendants were also enjoined from operating West Tennessee Alliance or any other company in which it co-owned shares of stock with private entities. The defendants were also enjoined from operating PPOs, such as Health Partners and Sight Care. From this order, the defendants now appeal.

On appeal, the defendants contend that the trial court erred by concluding that Article II, §§ 29 and 31 prohibit the District from co-owning with private entities shares of West Tennessee Alliance or any other company. They argue that the District is not a "county, city or town" within the meaning of Article II, § 29 of the Tennessee Constitution. They note that the Hospital Authority Act authorizes the District to own a provider network jointly with private individuals. They contend that Article II, § 31 of the Tennessee Constitution, prohibits "the State," but not an entity such as the District, from operating PPOs, such as Health Partners and Sight Care. The Attorney General asserts

that the trial court erred to the extent that it found that the Hospital Authority Act violates the Tennessee Constitution.[1]

Summary judgment should be granted when the movant demonstrates that there are no genuine issues of material fact and that the moving party is entitled to a judgment as a matter of law. Tenn. R. Civ. P. 56.03. The party moving for summary judgment bears the burden of demonstrating that no genuine issue of material fact exists. *Byrd v. Hall*, 847 S.W.2d 208, 211 (Tenn. 1993). On a motion for summary judgment, the court must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence. *Id.* at 210-11. Summary judgment is only appropriate when the facts and the legal conclusions drawn from the facts reasonably permit only one conclusion. *Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn. 1995). Since only questions of law are involved, there is no presumption of correctness regarding a trial court's grant of summary judgment. *Id.* Therefore, our review of the trial court's grant of summary judgment is *de novo* on the record before this Court. *Id.*

## LEGISLATION

The defendants argue first that their actions are not prohibited by Article II, § 29 of the Tennessee Constitution because the District is not a "county, city or town" within the meaning of that provision. Against the background of the pertinent legislation, we shall examine Section 29.

The Hospital Authority Act was passed to enable private act hospitals to compete in the health care market. Several of its provisions incorporate by reference the Private Act Metropolitan Authorities Act of 1995 ("Metropolitan Authorities Act"), Tenn. Code Ann. §§ 7-57-501 et seq. (Supp. 1997). The Metropolitan Authorities Act sets forth its purpose:

> The general assembly hereby finds that the demand for hospital, medical and health care services is rapidly changing as is the way and manner in which such services are purchased and delivered; that the market for hospital and health care services is becoming increasingly competitive; and that the hospital and other health care providers need flexibility to be able to respond to changing conditions by having the power to develop efficient and cost-effective methods to provide for hospital, medical and health care needs. The general assembly also finds that the increasing competition and changing conditions forces hospitals and other health care providers to develop market strategies and strategic plans to effectively compete. The general assembly further finds that public hospitals in metropolitan areas are presently at a competitive disadvantage, and that significant investments in the public assets of

---

[1] An Amici Curiae brief was filed by the Tennessee Hospital Association, the Tennessee Association of Public and Teaching Hospitals, Inc., and the Hospital Alliance of Tennessee, Inc..

private act metropolitan hospital authorities could be jeopardized by inability to compete with private hospitals because of legal constraints upon the scope of their operations and limitations upon the power granted to public hospitals under existing law.

Tenn. Code Ann. § 7-57-501(b).

The Hospital Authority Act broadened the powers of hospitals created by private act. The broadened powers include the power to:

participate as a shareholder in a corporation, as a joint venturer in a joint venture, as a general partner in a general partnership, as a limited partner in a limited partnership or a general partnership, as a member in a nonprofit corporation or as a member of any other lawful form of business organization, which provides hospital, medical or health care or engages in any activity supporting or related to the exercise of any power granted to a private act metropolitan hospital authority;

Tenn. Code Ann. § 7-57-603 (incorporating Tenn. Code Ann. § 7-57-502(b)(1)). Such hospitals may:

acquire, manage, lease, purchase, sell, contract for or otherwise participate solely or with others in the ownership or operation of hospital, medical or health program properties and facilities and properties, facilities, and programs supporting or relating thereto of any kind and nature whatsoever and in any form of ownership whenever the board of trustees in its discretion shall determine it is consistent with the purposes and policies of this part or any private act applicable to it, and may exercise such powers regardless of the competitive consequences thereof.

Tenn. Code Ann. § 7-57-603 (incorporating Tenn. Code Ann. § 7-57-502(c)).

The District was created by Chapter 686 of the 1949 Private Acts to own the Jackson-Madison County General Hospital. Its "mission and purpose":

shall be for the benefit of the City of Jackson, Tennessee and Madison County, Tennessee, to provide, on a fee-for-service basis with due regard for the needs of low-income and indigent patients, the full range of health care (including mental illness), illness prevention and allied and incidental services and operations.

1992 Tenn. Priv. Acts ch. 165, § 1. The Act created a Board of Trustees, whose directors are to serve without compensation. 1949 Tenn. Priv. Acts ch. 686, § 3. The Board's power includes:

full, absolute and complete authority and responsibility for the operation, management, conduct and control of the business and affairs of the Hospital District herein created, which business and affairs may include without limitation the provision of health care services for persons in their homes; . . . . Said authority and responsibility shall include, but shall not be limited to, the establishment, promulgation and enforcement of the rules, regulations, and policies of the District, the upkeep and maintenance of all property, the administration of all financial affairs of the District, the execution of all contracts, agreements and other instruments, and the employment, compensation, discharge and supervision of all personnel.

*Id.* ch. 686, § 8 (as amended by 1989 Tenn. Priv. Acts ch. 26, § 2). The private act provides that:

the County Legislative Body of Madison County is hereby authorized to appropriate to the Hospital District from the General Fund of the County one-half of such sums

4

as may be required to commence the operation of said District, and thereafter one-half of such sums as may be required to pay any deficits arising in the operation and maintenance of said District; and are authorized and empowered, also, to levy a tax sufficient for the purpose upon all taxable property within the said County.

*Id.* ch. 686, § 13 (as amended by 1992 Tenn. Priv. Act ch. 165, § 2).

## SECTION 29

Article II, § 29 of the Tennessee Constitution states as follows:

The General Assembly shall have power to authorize the several counties and incorporated towns in this State, to impose taxes for County and Corporation purposes respectively, in such manner as shall be prescribed by law; and all property shall be taxed according to its value, upon the principles established in regard to State taxation. But the credit of no County, City or Town shall be given or loaned to or in aid of any person, company, association or corporation, except upon an election to be first held by the qualified voters of such county, city or town, and the assent of three-fourths of the votes cast at said election. *Nor shall any county, city or town become a stockholder with others in any company, association or corporation except upon a like election, and the assent of a like majority. . . .*

(emphasis added).

The defendants argue that the trial court effectively declared the Hospital Authority Act unconstitutional by interpreting Section 29 to include the District within the meaning of the phrase, "county, city or town." Since the trial court's ruling precludes the District from exercising powers expressly authorized by the Hospital Authority Act, they contend that the trial court has rendered the statute a nullity.

The plaintiffs maintain that the defendants have exaggerated the consequences of the trial court's ruling. They insist that the trial court at no point deemed the statute to be unconstitutional. They note that the Metropolitan Hospital Authorities Act limits the powers granted under the statute "to the extent at the time [that the powers granted are] not prohibited by the Constitution of Tennessee." Tenn. Code Ann. § 7-57-502(b). They emphasize that the Hospital Authority Act does not explicitly authorize the District to co-own shares with *private* entities. The plaintiffs assert that the trial court's holding is limited to the determination that the District itself acted *ultra vires* by unconstitutionally co-owning shares with others.

In response to the defendants' argument on the meaning of Section 29, the plaintiffs argue that the District is encompassed within the meaning of "county, city or town." The trial court found that the District "is a joint venture of the City of Jackson and Madison county." The plaintiffs contend that the District's ownership of West Tennessee Alliance is prohibited since the District co-owns shares of the PHO with private entities. The defendants argue that, as a matter of law, the

5

District is a distinct entity from the City of Jackson and Madison County and that, therefore, Section 29 does not apply. They assert that the District's ownership of West Tennessee Alliance is explicitly authorized by the Hospital Authority Act.

No published Tennessee decisions directly address the interpretation of the phrase, "county, city or town," in Section 29. Originally, Section 29 consisted of only the first sentence. The remaining language was added in 1870 during the period of Reconstruction.[2] Tennessee, like many other states, added this prohibition to its Constitution to prevent itself from becoming burdened by debt resulting from "public financial support of privately sponsored 'internal improvements.'" Lewis L. Laska, *A Legal and Constitutional History of Tennessee, 1772-1972*, 6 Mem. St. L. Rev. 563, 640-41 (1976). The reason for these provisions has been described as follows:

> Early in the nineteenth century it seems to have been the general practice of states to encourage the building of railroads by permitting the state or a subdivision thereof to purchase stock in railroad corporations, to issue bonds or lend credit in aid of railroads, or to make outright donations to them. However, due to the large number of insolvencies or railroads, caused by frauds or economic conditions, states and subdivisions thereof found themselves largely indebted, and were themselves occasionally insolvent because of large investments in such enterprises. Therefore a reversal of policy set in. As early as 1851 Ohio adopted a constitution containing a provision prohibiting stock subscriptions or other forms of aid to corporations. In the ensuing twenty-five years most of the other states adopted similar provisions, either prohibiting aid altogether or requiring a vote of the people before a subscription to stock or other sort of aid could be made or extended.

Annotation, *Constitutional or statutory provisions prohibiting municipalities or other subdivisions of the state from subscribing to, or acquiring stock of, private corporations*, 152 A.L.R. 495, 495-96 (1944). Adoption of such provisions:

> represents the reaction of public opinion to the orgies of extravagant dissipation of public funds by counties, townships, cities, and towns in aid of construction of railways, canals, and other like undertakings during the half century preceding 1880, and it was designed to primarily to prevent the use of public funds raised by general taxation in aid of enterprises apparently devoted to quasi public purposes, but actually engaged in private business.

*Thaanum v. Bynum Irr. Dist.*, 232 P. 528 (Mont. 1925); *see also* Arthur P. Roy, Note, *State Constitutional Provisions Prohibiting the Loaning of Credit to Private Enterprise--A Suggested Analysis*, 41 U. Colo. L. Rev. 135 (1969); Stewart E. Sterk & Elizabeth S. Goldman, *Controlling Legislative Shortsightedness: The Effectiveness of Constitutional Debt Limitations*, 1991 Wis. L. Rev. 1301 (1991).

---

[2] Article II, § 31 was also added to the Tennessee Constitution at this time.

In interpreting a constitutional provision, effect must be given to its "ordinary and inherent meaning." *Gaskin v. Collins*, 661 S.W.2d 865, 867 (Tenn. 1983). The intent at the time of enactment must be examined:

> Since constitutions derive their power and authority from the people, our articulation of constitutional principles must capture the intentions of the persons who ratified the constitution. These intentions are reflected in the words of the constitution itself, rather than our own subjective notions of unexpressed constitutional intent.

*Martin v. Beer Bd.*, 908 S.W.2d 941, 947 (Tenn. App. 1995) (internal citation omitted). The language of Section 29 suggests that the drafters intended that the phrase, "county, city or town," be confined to its literal meaning. The first sentence of Section 29 empowers the General Assembly to authorize counties and towns to impose taxes. The second sentence limits the ability of cities, counties, and towns to lend credit. The second sentence begins with the word, "but." The third sentence, prohibiting such cities, counties, and towns from co-owning stock, begins with the word, "nor." Considering these three sentences together, the limitations in the second and third sentences plainly modify the entities described in the first sentence.

In *Lipscomb v. Dean*, 69 (1 Lea) Tenn. 546 (Dec. Term 1878), the Court considered whether the General Assembly could delegate the power to levy taxes to school districts or civil districts within a county. Finding that the General Assembly could not delegate such a task, the Court reasoned as follows:

> The power to authorize incorporated towns and counties to levy taxes for corporation and county purposes, is the only part of our Constitution which we can find that gives the Legislature any power to delegate the right of taxation. The clause appeared for the first time in the Constitution of 1834, and was copied in that of 1870.
> It is a sufficient fact, that in the constitutional convention of 1870, when sec. 29, art. 2, was under consideration, Mr. Seay offered an amendment to insert civil districts after the word counties, so as to give the Legislature power to authorize the civil districts to levy and collect taxes, but the amendment offered was at once rejected.
> All the authorities, as well as common sense, agree in the rules that language must be interpreted in the light of things surrounding the parties using the words to be interpreted. When the Constitution of 1834 was framed and ratified, there was no such thing in this State as an incorporated town other than one of *fixed and defined limits*, invested with powers of municipal government, and this for local and police purposes. Such was the condition of things in 1870, and such alone is the sense in which the "incorporated towns" were used, and to this it must be confirmed.

*Id.* at 552-53 (emphasis added).

Thus, the Court in *Lipscomb* indicates that the drafters of the Constitution intended for only cities, counties, or towns, in the plain sense of the words, to have the power to levy taxes. It notes

that an effort to broaden the phrase to include "civil districts" was defeated during the 1870 constitutional convention. *Id.* Since the third sentence of Section 29 refers to such cities, counties, or towns, the limitation in the third sentence appears to apply only to cities, counties, and towns with taxing powers.

In *Gibson County Special School Dist. v. Palmer*, 691 S.W.2d 544 (Tenn. 1985), the Court addressed whether a special school district, created by the General Assembly, could assess taxes. The Court held:

> Article 2, § 29 of the Tennessee Constitution permits the legislature to delegate its taxing power to counties and towns. It has been previously held by Tennessee courts that special school districts do not fall within the purview of § 29 of Article 2 and that legislation granting to special school districts the power to levy taxes is an unconstitutional delegation of the taxing authority.

*Id.* at 549 (citing *Williamson v. McClain*, 147 Tenn. 491, 249 S.W. 811 (1923)); *see also West Tennessee Flood Control & Soil Conserv. Dist. v. Wyatt*, 193 Tenn. 566, 247 S.W.2d 56 (1952) (holding that the West Tennessee Flood Control and Soil Conservation District was not authorized to assess taxes).

Several Tennessee cases have addressed whether agencies and instrumentalities of municipalities have the power to issue bonds without being subject to the limitation set forth in the second sentence of Section 29. In each of these cases, the Court narrowly defined the term "county, city or town" and found that Section 29 did not prevent the entities from issuing bonds so long as the municipality was not compelled to invoke its taxing power to make payment on the issuance. *See West v. Industrial Dev. Bd.*, 206 Tenn. 154, 159, 332 S.W.2d 201, 203 (1960) (bonds issued by an industrial development board); *Fort Sanders Presbyterian Hosp. v. Health & Educ. Facilities Bd.*, 224 Tenn. 240, 250, 453 S.W.2d 771, 775 (1970) (bonds issued by health & educational facilities board); *Metropolitan Dev. & Housing Agency v. Leech*, 591 S.W.2d 427, 429 (Tenn. 1979) (bonds issued by housing agency).

In this case, we must determine whether the District should be considered a city, county, or town. The District is a "quasi-municipal corporation." *Finister v. Humboldt Gen. Hosp.*, No. 02501-9704-CH-00038, 1998 WL 321850, at *4 (Tenn. May 26, 1998); *Professional Home Health & Hospice, Inc. v. Jackson-Madison County General Hosp. Dist.*, 759 S.W.2d 416, 419 (Tenn. App. 1988).

The plaintiffs argue that the Private Act creating the District obligates Madison County to

8

finance any deficits that may arise. However, the Private Act states only that Madison County "is hereby authorized to appropriate" funds to commence operations and pay operating deficits; it is not *obligated* to do so. *See* 1949 Tenn. Priv. Acts ch. 686, § 13 (as amended by 1992 Tenn. Priv. Act. ch. 165, § 2). The record indicates that revenues generated by the District are controlled solely by the District's Board and are autonomous from the general funds controlled by the city and county. Under these circumstances, the District is clearly not a taxing power within the meaning of the phrase "city, county or town" in Section 29. Instead, it is an autonomous quasi-municipal entity.

This conclusion is consistent with the Tennessee Supreme Court's holding that the office of trustee for the hospital authority in Chattanooga-Hamilton County is not a "county office" within the meaning of Article XI, § 17 of the constitution, but "rather an office of an independent governmental entity." ***Chattanooga-Hamilton County Hosp. Auth. v. City of Chattanooga***, 580 S.W.2d 322, 329 (Tenn. 1979). The plaintiffs respond that, nine years later, the Supreme Court, interpreting the same private act hospital authority, held that the authority was "a subdivision of the state and county." ***Johnson v. Chattanooga-Hamilton County Hosp. Auth.***, 749 S.W.2d 36, 37 (Tenn. 1988). In ***Johnson***, however, the Court held that the Chattanooga-Hamilton County Hospital Authority was exempt from the worker's compensation statute, which does not apply to "the state of Tennessee, counties thereof, and municipal corporations." ***Id.*** at 37-38; Tenn. Code Ann. § 50-6-106 (Supp. 1997). ***See also Finister***, ***supra***, at *4 (holding that a hospital district is an "exempt quasi-municipal corporation" pursuant to the Tennessee Workers' Compensation Act). The determination of whether a hospital authority is exempt from the worker's compensation statute is an issue separate from whether a hospital authority is a "county, city or town" within the meaning of the Tennessee Constitution. As noted above, to determine the meaning of the phrase "county, city or town" in Section 29, we must look to the intent of the framers of the Constitutional provision, not the intent of a later legislature in enacting a wholly unrelated statute.

Similarly, the plaintiffs cite ***Crowe v. John W. Harton Mem'l Hosp.***, 579 S.W.2d 888 (Tenn. App. 1979), for the proposition that a public hospital is considered to be an "instrumentality" of a municipality so that it is covered by the Governmental Tort Liability Act ("GTLA"), Tenn. Code Ann. §§ 29-20-101 et seq. (1980 & Supp. 1997). The GTLA applies to "governmental entities," which include:

> any political subdivision of the state of Tennessee including . . . any instrumentality

of government created by any one (1) or more of the herein named local governmental entities.

Tenn. Code Ann. § 29-20-102(3) (Supp. 1997). Again, the definition of "governmental entities" pursuant to a statute such as the GTLA has no bearing on the definition of "county, city or town" pursuant to Article II, § 29.

This holding is consistent with decisions interpreting similar constitutional provisions of other states. The language "city, county or town," contained in Article II, Section 29 of the Tennessee Constitution is more narrow than the language found in the correlating provisions of the majority of the constitutions of other states. The constitutions of most states extend restrictions on stock ownership to entities beyond counties, cities and towns.[3]

In *Harshman v. Bates County*, 92 U.S. 569, 23 L.Ed. 747 (1876), *overruled on other grounds by Cass County v. Johnston*, 95 U.S. 360, 365, 24 L.Ed. 416 (1877), the United States Supreme Court considered a Missouri constitutional provision restricting the state legislature from "authoriz[ing] any county, city or town to become a stockholder in . . . any company, association or corporation." The issue concerned whether the phrase, "county, city or town," included townships, which were subdivisions of counties. *Harshman*, 23 L.Ed. at 747. The Court held that the "manifest intention and spirit" of the term included townships, since they had "no power to act as corporate bodies." *Id.* The Court, nevertheless, surmised that:

> [h]ad counties alone been mentioned, there might have been no restriction as to cities and towns; because they are separate and distinct organizations, corporate in character, and often clothed with legislative functions.

*Id.*

The Kentucky Court of Appeals considered whether a municipal housing commission could privately insure its housing projects in *City of Louisville Mun. Housing Comm'n v. Public Housing Admin.*, 261 S.W.2d 286 (Ky. App. 1953). The applicable constitutional provision prohibits "any county or subdivision thereof, city, town, or incorporated district, [from] becom[ing] a stockholder

---

[3] *See, e.g.,* Ala. Const. art. IV, § 94 ("county, city, town, or other subdivision of this state . . ."); Ark. Const. XII, § 5 ("county, city, town or other municipal corporation . . ."); Fla. Const. art. VII, § 10 ("state nor any county, school district, municipality, special district, or agency of any of them . . ."); Ky. Const. § 179 ("county or subdivision thereof, city, town, or incorporated district . . ."); Miss. Const. art. VII, §183 ("county, city, town, or other municipal corporation . . ."); Mo. Const. art. XIII, § 1 ("state, nor any county, city, town, municipality, nor other subdivision of the state . . ."); Okl. Const. art. X, § 17 ("county or subdivision thereof, city, town, or incorporated district . . ."); Tex. Const. art. III, § 52 ("county, city, town or other political corporation or subdivision of the State . . .").

in any company, association or corporation." Ky. Const. § 179. The commission, formed by the Kentucky legislature, retained "some of the attributes of a state agency although it [was] controlled by the Mayor of Louisville." *City of Louisville*, 261 S.W.2d at 287. The parties did not contend that the commission was a county, subdivision of a county, city, or town; instead the issue concerned whether the commission qualified as an "incorporated district" pursuant to the constitutional provision. *Id.*

After applying an "ordinary and commonly accepted" interpretation of the terminology, as well as taking into consideration the intent of the drafters, the Court held that "the ordinary meaning of the word, 'Commission,' denotes something different from 'District.'" *Id.* at 288. The Court found that the fact that the commission operated within defined territorial boundaries did not "transform the Commission into a District." *Id.* The Court reasoned that the commission:

> is neither "fish nor fowl" within the definitive ter[m] of sectio[n] . . . 179. It may be said to be a hybrid, conceived for a purpose not contemplated by the framers of our Constitution.

*Id.*

In *Thaanum v. Bynum Irr. Dist.*, 232 P. 528 (Mont. 1925), the Montana legislature created an irrigation district for the purpose of irrigating land in the Grand Teton area. The district's board was granted broad authority to take steps to accomplish its objective. *Id.* The suit arose after the district acquired an option to purchase certain shares of stock of a private company or, alternatively, the right to purchase from the acquirers of these shares the right to use the water owned by the private company. *Id.* The Montana Constitution proscribes the "state, nor any county, city, town, municipality, nor other subdivision of the state" from becoming a "subscriber to, or a shareholder in, any company or corporation . . . ." Mont. Const. art. 13, § 1.

After considering the history behind the constitutional provision, the Court concluded that the irrigation district did not constitute the "state, . . . county, city, town, municipality, [or] other subdivision of the state." *Id.*; *Thaanum*, 232 P. at 530-31. The Court noted that one characteristic that distinguished the district from the entities expressly mentioned in the constitutional provision was the power to impose taxes. *Id.* at 531.

In *Day v. Buckeye Water Conserv. Drainage Dist.*, 237 P. 636 (Ariz. 1925), an irrigation district was formed pursuant to an Arizona statute. The district entered into an elaborate agreement with a private company. *Id.* at 637-38. The plaintiff challenged the district's conduct based on

11

Article IX, § 7 of the state constitution. This provision provides that:

> Neither the state, nor any county, city, town, municipality, or other subdivision of the state shall ever give or loan its credit in the aid of, or make any donation or grant, by subsidy or otherwise, to any individual, association, or corporation, or become a subscriber to, or a shareholder in, any company or corporation or become a joint owner with any person, company, or corporation, except as to such ownerships as may accrue to the state by operation or provision of law.

Ariz. Const. art. IX, § 7. The issue in *Day* was whether the district was included within the phrase, "other subdivision of the state." *Day*, 237 P. at 638.

After considering the history behind the provision and after applying the canon of *ejusdem generis*, the Court found that the district was not within the phrase "other subdivision of the state" as contemplated by the framers of the Arizona Constitution. *Id.* The Court found that the district's functions were markedly dissimilar from the functions of counties, cities, towns, and municipalities mentioned in the provision. *Id.* The Court noted that:

> irrigation districts and similar public corporations, while in some senses subdivisions of the state, are in a very different class. Their function is purely business and economic, and not political and governmental.

*Id.*

The Court also emphasized that a contrary ruling would jeopardize the viability of such public corporations. It reasoned:

> In many cases the only way in which they can carry out the sole purpose of their existence is by some plan of joint control or ownership forbidden by section 7, supra. To hold that they belong to the "other subdivisions of the state" referred to in that section would be in effect to prohibit their existence.

*Id.* at 638-39. Citing *Thaanum*, *supra*, the Court held that the district did not fall within the ambit of the constitutional provision. *Day*, 237 P. at 639; *see also Maricopa County Mun. Water Conserv. Dist. No. 1. v. La Prade*, 40 P.2d 94, 99-100 (Ariz. 1935). Courts of other states utilized similarly narrow interpretations of comparable constitutional provisions in decisions rendered not long after the provisions were ratified. *See, e.g., In re Bonds of Madera Irrigation Dist.*, 28 P. 675, 676 (Cal. 1892) ("This prohibition in the constitution is Limited [sic] to the public corporations enumerated in that section, viz., 'county, city, town, township, board of education, or school-district,' and, under familiar rules of construction, cannot be extended to any other public corporation."); cases cited in Ann., 152 A.L.R. at 505-08.

In *Arkansas Unif. & Linen Supply Co. v. Institutional Serv. Corp.*, 700 S.W.2d 358 (Ark. 1985), a group of plaintiffs operating commercial laundries challenged the activity of an Arkansas

city and a hospital located within the city. The city owned the hospital facility and the land, and leased them to the hospital. *Id.* at 359. New board members of the hospital were nominated by the board, and confirmed by the city council. *Id.* In the event that the hospital should dissolve, the city was granted ownership of all of the hospital's assets. *Id.* The plaintiffs brought suit when the hospital incorporated a laundry service business. *Id.* The plaintiffs claimed that the defendants violated Article XII, § 5 of the Arkansas Constitution, since the city was lending credit to and becoming a stockholder in a private company.[4] *Id.*

The Arkansas Supreme Court held that the issue was whether the hospital was the "alter ego" of the city council. *Id.* at 360. Although the city council confirmed the board's nominees, the Court noted that it had never rejected any of the board's nominees in the past. *Id.* The Court also pointed out that the dissolution provision was drafted to comply with a statutory charitable tax exemption provision and that the leasing arrangement between the city and the hospital was expressly authorized by an Arkansas statute. *Id.* Thus, the Court found that the hospital was sufficiently autonomous to avoid being "the arm of the city council." *Id.* at 361. *See also Fairfax County Indus. Dev. Auth. v. Coyner*, 150 S.E.2d 87, 94 (Va. 1966) (industrial development authority not a "county, city or town" when it issues revenue bonds since no municipality "grants its credit or becomes liable in any manner for the payment of the bonds and obligations of the [a]uthority."); *Public Utility Dist. No. 1 v. Taxpayers & Ratepayers of Snohomish County*, 479 P.2d 61, 63-64 (Wash. 1971) (joint ownership of power plant by municipal corporations and private companies did not violate state constitution since the public shareholders retained veto power and, thus, were not "subject to the overriding control of a shareholder majority."); *but cf. Wilmington Parking Auth. v. Ranken*, 105 A.2d 614, 627-28 (Del. 1954) (constitutional phrase "county, city, town or other municipality" included a parking authority).

Consequently, we hold that the District is not a "county, city or town" within the meaning of Article II, Section 29 of the Tennessee Constitution and that, therefore, the defendants' actions

---

[4] This provision states:

No county, city, town, or other municipal corporation shall become a stockholder in any company, association or corporation; or obtain or appropriate money for, or loan its credit to, any corporation, association, institution or individual.

Ark. Const. art. 12, § 5.

do not violate Section 29.  The trial court is reversed on this issue.

## SECTION 31

Article II, § 31 of the Tennessee Constitution states:

> The credit of this State shall not be hereafter loaned or given to or in aid of any person, association, company, corporation or municipality; nor shall the State become the owner in whole or in part of any bank or a stockholder with others in any association, company, corporation or municipality.

Since the trial court found that the District's part ownership of West Tennessee Alliance violated Section 31, it implicitly found that the District is an "arm of the State."  The defendants contend that the provision applies only to the State itself.  In the alternative, the defendants maintain that even if the District is an "arm of the State," the District's activities do not violate Section 31 since it is performing a public function, rather than a proprietary function.

The plaintiffs cite no cases indicating that the term "State" as set forth in Section 31 should be construed broadly, so as to include an "arm" of the State.  Indeed, if "State" in Section 31 were broadly construed, Section 29 would be unnecessary.  Section 29 permits a county, city or town to own stock with others if the arrangement is approved by the electorate.  If the term "State" in Section 31 were interpreted broadly, it would include counties, cities and towns and would render Section 29 meaningless.  The existence of Section 29 indicates that the term "State" in Section 31 should be narrowly construed. ***See Summers v. Thompson***, 764 S.W.2d 182, 195 (Tenn. 1988) (holding that the Tennessee Constitution must be construed *in pari materia*).

Courts in other states have also interpreted the term narrowly when considering comparable constitutional provisions.  In ***City of Louisville***, ***supra***, the Kentucky Court of Appeals considered whether a constitutional provision barring "the Commonwealth [from] becom[ing] an owner or stockholder" proscribed the housing commission's activities. ***City of Louisville***, 261 S.W.2d at 287 (citing Ky. Const. § 177).  The Court held that "[o]bviously, the Housing Commission is not the Commonwealth." ***Id.***  The Court maintained that, regardless of whether the commission is considered an agency of the Commonwealth, "[w]e have no doubt the prohibition in that section is directed to the Commonwealth as such and not to an agency such as this Housing Commission is shown to be." ***Id.***  Thus, the Court held that the commission was "neither 'fish nor fowl' within the definitive terms" of the constitutional provisions. ***Id.*** at 288.

Oklahoma, like Tennessee and Kentucky, has separate constitutional provisions that address

governmental aid to corporations. Article X, § 15 of the Oklahoma Constitution prohibits the "State" from becoming a stockholder. Article X, § 17 prohibits "any county or subdivision thereof, city, town, or incorporated district" from becoming a stockholder. Oklahoma courts have held that § 15 does not apply to municipalities since that provision is limited to the state. *See Fretz v. City of Edmund*, 168 P. 800, 804 (Okl. 1916); *Lawrence v. Schellstede*, 348 P.2d 1078, 1081 (Okl. 1960).

In *Andres v. First Arkansas Dev. Fin. Corp.*, 324 S.W.2d 97 (Ark. 1959), the Arkansas legislature passed a statute creating corporations to provide financial assistance to industrial development. The plaintiffs claimed that the statute violated a state constitutional provision restricting the state from "lend[ing] its credit."[5] *Id.* at 100. The Court dismissed the argument that the development corporations were an alter ego of the state. *Id.* The Court reasoned that "[t]he State is not 'lending its credit' merely because it authorizes the organization of a corporation which may finance industrial development corporations." *Id.*

Plaintiffs in *Steup v. Indiana Housing Fin. Auth.*, 402 N.E.2d 1215 (Ind. 1980), challenged a statute by the Indiana legislature creating a finance authority. The finance authority was authorized to create an entity to provide facilities for lower income persons and families. *Id.* at 1220. The plaintiffs alleged that this authorization violated a constitutional provision prohibiting the state from "becom[ing] a stockholder." *Id.*; Ind. Const. art. XI, § 12. Finding that the authority "is not the state in its sovereign capacity," the Indiana Supreme Court held that the constitutional provision was inapplicable. *Steup*, 402 N.E.2d at 1220; *see also Sendak v. Trustees of Indiana Univ.*, 260 N.E.2d 601, 602-04 (Ind. 1970) (Indiana University not considered "state"); *Thaanum*, 232 P. at 530 (irrigation district "is not the state"); citations listed in Ann., 152 A.L.R. at 505-08; *Coyner*, 150 S.E.2d at 94 (constitutional credit clause does not apply to industrial development authority since the Commonwealth is not liable for bonds issued by the authority); *Sprague v. Straub*, 451 P.2d 49, 57-59 (Ore. 1969) (constitutional prohibition of state ownership of corporate stock does not apply to investment of industrial accident commission fund and public employees' retirement fund,

_____

[5] The provision states:

Neither the State nor any city, county, town or other municipality in this State, shall ever lend its credit for any purpose whatever . . .

Ark. Const. art. XVI, § 1.

15

since the state has no proprietary interest in these funds); *but cf. **Board of Trustees of the Public Employees' Retirement Fund of Indiana v. Pearson***, 459 N.E.2d 715, 717-18 (Ind. 1984) (investment of state employees' retirement fund in stock of private companies violated constitutional provision since the state could suffer a loss if the stock value fell); ***West Virginia Trust Fund, Inc. v. Bailey***, 485 S.E.2d 407, 420-21 (W. Va. 1997) (state trust fund violated constitutional provision since it was an "alter ego" of the state); ***State ex rel. Gainer v. West Virginia Bd. of Investments***, 459 S.E.2d 531, 534-37 (W. Va. 1995) (until public employees' pension funds actually withdrawn, the state has a beneficial ownership interest and, thus, the state has unconstitutionally become a stockholder).

In the case at bar, under a narrow interpretation of the term "State" in Section 31, the District clearly is not the State. The District's board of directors is not selected by the State, its operations are not supported by State revenue, and the State is under no obligation to cover any deficit that the District may incur.

The plaintiffs argue that the State may not delegate a power that it does not itself possess. Citing ***State ex rel. Bd. of Dental Examiners v. Allen***, 192 Tenn. 396, 241 S.W.2d 505 (1951), the plaintiffs claim that since Section 31 prohibits the General Assembly from co-owning shares, it may not avoid this prohibition by creating hospital authorities and granting them authority to co-own shares. In *Allen*, a state statute authorized a county to permit an unlicensed person to practice dentistry. *Id.*, 192 Tenn. at 397, 241 S.W.2d at 505. Thus, the statute carved out an exception to the "general law applicable to the entire State," forbidding the unlicensed practice of dentistry. *Id.*, 192

Tenn. at 398, 241 S.W.2d at 506. The Court held that the statute violated Article XI, § 8, which prohibits suspending:

> any general law for the benefit of any particular individual, or to pass any law granting to any individual rights, privileges, or immunities not extended to any other member of the community who may be able to bring himself within the provisions of such law.

*Id.* (quoting *Lineberger v. State ex rel. Beeler*, 174 Tenn. 538, 541, 129 S.W.2d 198, 199 (1939)). The Court reasoned that the General Assembly may not "delegate to the Quarterly Court of a County the authority to do an act which the Constitution forbids the Legislature from doing." *Allen*, 192 Tenn. at 399, 241 S.W.2d at 506.

The plaintiffs' reliance on *Allen* is misplaced. *Allen* holds that municipal ordinances are subject to the same constitutional restraints as statutes. Since the General Assembly may not enact a statute suspending a general prohibition, it may not circumvent Article XI, § 8 by authorizing a county to suspend the general prohibition. *Allen* has no bearing on whether Section 31 forbids governmental entities other than the State from co-owning shares. The Tennessee Constitution is a limitation of powers, not a source of power. *Perry v. Lawrence County Election Comm'n*, 219 Tenn. 548, 551, 411 S.W.2d 538, 539 (1967). Thus, the General Assembly may enact any legislation that is not forbidden by the Tennessee or federal constitutions. *Fentress County Beer Bd. v. Cravens*, 209 Tenn. 679, 687, 356 S.W.2d 260, 263 (1962).

Therefore, the District's co-ownership of West Tennessee Alliance or similar entities, now or in the future, does not violate Article II, Section 31 of the Tennessee Constitution. The decision of the trial court on this issue is reversed.

## ARTICLE I, SECTION 8

In its ruling, the trial court also enjoined the District from operating Sight Care, Health Partners, or any other PPO in the future, despite the fact that these entities are *solely* owned by the District. The trial court did not articulate its reasoning. The defendants assert that the Hospital Authorities Act authorizes their participation in the PPO business and that nothing in the Constitution prohibits such activity.

Presumably the trial court agreed with the plaintiffs' argument that Article I, § 8 of the Tennessee Constitution bars the governmental operation of PPOs. Article I, § 8, known as the "law

17

of the land" provision, states:

> That no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land.

Tenn. Const. art. I, § 8. The plaintiffs' argument is three-fold: 1) that the notion of a governmental entity engaging in a business already served by a private enterprise is repugnant to this provision and the spirit of the constitution; 2) that the defendants deprived the plaintiffs of procedural due process of law; and 3) that the defendants deprived the plaintiffs of equal protection of the laws.

The plaintiffs cite no authority for the proposition that Tennessee law forbids governmental entities from engaging in a proprietary capacity. In fact, governmental entities frequently act as market participants. *See, e.g., Reeves, Inc. v. Stake*, 447 U.S. 429, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980) (state owned and operated a cement plant). Under the plaintiffs' reasoning, state and local governments could not operate a hospital, since private hospitals exist. As noted above, the Tennessee Constitution is a limitation of powers, not a source of power. *Perry*, 219 Tenn. at 551, 411 S.W.2d at 539. Thus, the General Assembly may enact any legislation not forbidden by the Tennessee or federal constitutions. *Cravens*, 209 Tenn. at 687, 356 S.W.2d at 263. Under the Hospital Authorities Act, the General Assembly granted the District the right to participate in the PPO business. The District's ownership of PPOs, such as Sight Care or Health Partners, is authorized by the legislature and not forbidden by the Tennessee Constitution. This argument is without merit.

The plaintiffs also argue that the defendants deprived them of procedural due process of law. The plaintiffs assert that they were denied due process when they were denied membership in Sight Care and when their contracts with Health Partners were terminated, because they were not afforded a hearing or an explanation for the defendants' action or inaction.

The due process provision in Article I, § 8 is consonant with the due process clause in the Fourteenth Amendment of the United States Constitution. *Riggs v. Burson*, 941 S.W.2d 144, 51 (Tenn. 1997). In *Rowe v. Board of Educ. of the City of Chattanooga*, 938 S.W.2d 351, 354 (Tenn. 1996), the Tennessee Supreme Court held:

> In addressing a claim of an unconstitutional denial of procedural due process, we apply a two-step analysis. Initially we must determine whether [the plaintiffs'] interest rises to the level of a constitutionally protected property interest. If there is a constitutionally protected property interest, then the second step is to weigh the competing interests of the plaintiff and government to determine what process is due

18

and whether deprivation has occurred.

With regard to the first step of the two-step analysis, the Court stated:

> To be entitled to procedural due process protection, a property interest must be more than a "unilateral expectation" or an "abstract need or desire."  It must be a "legitimate claim of entitlement" to a specific benefit.

*Id.* (quoting *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972)).  Thus, the claimant must have a "vested right" in order to assert this provision.  *Kaylor v. Bradley*, 912 S.W.2d 728, 735 (Tenn. App. 1995).

Once an entitlement is shown, "the Due Process Clause simply does not mandate that all government decisionmaking comply with standards that assure perfect, error-free determinations." *State, ex rel. McCormick v. Burson*, 894 S.W.2d 739, 743-44 (Tenn. App. 1994) (quoting *Mackey v. Montrym*, 443 U.S. 1, 13, 99 S.Ct. 2612, 2618, 61 L.Ed.2d 321 (1979)).  Instead, "[d]ue process is flexible and calls for such procedural protections as the particular situation demands." *State v. Pearson*, 858 S.W.2d 879, 885 (Tenn. 1993) (quoting *Matthews v. Eldridge*, 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976)).  Three factors should be considered when determining the procedural safeguards that should be utilized:

> (1) the private interest affected by the official action; (2) the risk of erroneous deprivation of the interest through the procedures used and the probable value, if any, of additional safeguards; and, (3) the government's interest.

*Id.* (quoting *Matthews*, 424 U.S. at 335, 96 S.Ct. at 903).

The defendants do not dispute that the due process clause applies to them since they operate in a governmental capacity. *See Tennessee Cent. Ry. Co. v. Pharr*, 183 Tenn. 658, 664, 194 S.W.2d 486, 489 (1946) ("the requirements of due process of law extend to every case of the exercise of governmental power"); *Hinton v. Threet*, 280 F.Supp. 831, 840 (M.D. Tenn. 1968).  The question then becomes whether the individual plaintiffs have demonstrated a vested interest.  A "plaintiff has no constitutional right to practice his profession at a public facility." *Meredith v. Allen County War Mem'l Hosp. Corp.*, 397 F.2d 33, 35 (6th Cir. 1968) (citing *Hayman v. City of Galveston*, 273 U.S. 414, 47 S.Ct. 363, 71 L.Ed. 714 (1927)).  Thus, there is no merit in the proposition that the plaintiffs have an entitlement to become members of Sight Care or any other network arrangement. *Rowe*, 938 S.W.2d at 354.  No contract, statute, regulation, or any other act of law entitles them to

membership in Sight Care. Instead, the only interest articulated by the plaintiffs is a mere unilateral expectation or desire to be members. *Id.*

However, the individual plaintiffs were members of Health Partners. Their membership with Health Partners was governed by a preferred provider agreement. Outside of this agreement, there is no act of law, statutory or otherwise, that entitles the plaintiffs to be members of Health Partners. The agreement stated that either party may terminate the agreement "at any time, with or without cause, by giving at least 60 days prior written notice to the other party." The plaintiffs do not allege that the defendants failed to adhere to the terms of this contract and there is no allegation that Health Partners failed to follow its own procedures. The plaintiffs do not argue that their contracts could be terminated only for good cause.

Under these circumstances, the plaintiffs simply had no property interest in an indefinite continuation of their contractual relationship with Health Partners. The membership in Health Partners is analogous to employment at will. *See Rowe*, 938 S.W.2d at 355 ("Substitute teachers are not tenured . . . and have no 'legitimate claim of entitlement' to continued employment sufficient to give rise to a property interest."); *Gregory v. Hunt*, 24 F.3d 781, 785-87 (6th Cir. 1994) (under Tennessee law, "an at-will employee does not have a property interest in continued employment unless it can be shown that the employee had a reasonable expectation that termination would be only for good cause." *Id.* at 785). The plaintiffs do not allege that they have been denied staff privileges at a public hospital. *Cf. Armstrong v. Board of Directors*, 553 S.W.2d 77 (Tenn. App. 1976). The nature of the parties relationship does not entitle the plaintiffs to a hearing and an explanation for the termination of their contracts. Their only interest is a unilateral expectation or desire for the contractual relationship with Health Partners to continue. *Rowe*, 938 S.W.2d at 354.

Therefore, the denial of the individual plaintiffs' membership in Sight Care and the termination of their contracts with Health Partners without a hearing or an explanation does not violate the requirements of due process.

In addition, the plaintiffs argue that the defendants denied them equal protection of the law by treating "similarly situated citizens unequally."[6] The plaintiffs argue that the defendants

_____

[6] Equal protection is rooted in Article I, § 8 as well as Article XI, § 8. Article XI, § 8 declares:

The Legislature shall have no power to suspend any general law for the benefit of any

discriminated against them by denying them membership into the network while inviting similarly situated doctors to join.

Equal protection analysis under the Tennessee Constitution is identical to equal protection analysis under the United States Constitution. *Riggs*, 941 S.W.2d at 52. The standard of scrutiny applied depends on the nature of the right asserted or the class of persons affected. *Id.* Three standards of scrutiny exist:

> (1) strict scrutiny, (2) heightened scrutiny, and (3) reduced scrutiny, applying the rational basis test.

*Brown v. Campbell Bd. Of Educ.*, 915 S.W.2d 407, 413 (Tenn. 1995). In this case, the plaintiffs do not claim that they are a suspect class or that the defendants have denied them a fundamental right. Therefore, we apply rational basis review. *Riggs*, 941 S.W.2d at 53. Under rational basis review:

> if some reasonable basis can be found for the classification . . . or if any state of facts may reasonably be conceived to justify it, the classification will be upheld.

*Id.* (quoting *Tennessee Small School Systems v. McWherter*, 851 S.W.2d 139, 153 (Tenn. 1993); *Newton v. Cox*, 878 S.W.2d 105, 110 (Tenn. 1994)). This is a "lenient" standard under which a defendant may satisfy its burden merely by demonstrating "*any* possible reason or justification for the [the statute's] passage." *Exxon Corp. v. Eagerton*, 462 U.S. 176, 195, 103 S.Ct. 2296, 2308, 76 L.Ed.2d 497 (1983); *Kelley v. 3-M Co.*, 639 S.W.2d 437, 439 (Tenn. 1982) (emphasis added).

The policy underlying the General Assembly's decision to authorize the District to create PPOs is articulated in Tennessee Code Annotated § 7-57-501. The statute states that "the increasing competition and changing conditions forces hospitals and other health care providers to develop market strategies and strategic plans to effectively compete." *Id.* In order to compete in the health care market, provider networks must be exclusionary. The individual plaintiffs' provider agreements

particular individual, nor to pass any law for the benefit of individuals inconsistent with the general laws of the land; nor to pass any law granting to any individual or individuals, rights, privileges, immunitie [immunities] or exemptions other than such as may be, by the same law extended to any member of the community, who may be able to bring himself within the provisions of such law. No corporation shall be created or its powers increased or diminished by special laws but the General Assembly shall provide by general laws for the organization of all corporations, hereafter created, which laws may, at any time, be altered or repealed and no such alteration or repeal shall interfere with or divest rights which have become vested.

with Health Partners were terminated because Health Partners sought to "limit its provider network in Madison County to The Jackson Clinic, P.A., the West Tennessee Alliance for Healthcare, L.L.C., and physicians practicing in specialties or subspecialties not available through either of those organizations." A resolution adopted by the Health Partners' Board of Directors states that its provider network shall be limited so that it can enhance its ability to operate its managed care network. The resolution states that:

> this enhancement can be accomplished in the most cost-effective manner by contracting for physician services to the greatest extent possible with large multi-specialty entities which offer a structure for the development of internal medical management and utilization review programs and which effectively can enforce such programs with their member or employee physicians, thus limiting the cost to Health Partners, Inc., of such programs[.]

Soon thereafter, the Board of Governors of West Tennessee Alliance approved criteria for membership, which includes the following provision:

> As an expression of the commitment of the Company to integrity in the referral process, practitioners who have an Economic Conflict of Interest shall not be permitted to become or to remain Class P members of the Company.

Since the individual plaintiffs retain an interest in an outpatient ophthalmologic surgery center that competes with the District, Health Partners could reasonably have concluded that they had such an "Economic Conflict of Interest." Courts rarely "interfere with decisions which further the hospital's health care mission, even if they are at the expense of a doctor or group of doctors." *Alfredson v. Lewisburg Commun. Hosp.*, No. 88-311-II, 1989 WL 134739, *4 (Tenn. App. Nov. 8, 1989), *reversed in part on other grounds,* 805 S.W.2d 756 (Tenn. 1991). Consequently, we find a rational basis for the defendants' denial of membership in the PPOs to the individual plaintiffs. Accordingly, we hold that the defendants did not deprive the plaintiffs of the constitutional right of equal protection of law by denying them membership in the provider networks.

In sum, since the District is not a "county, city or town" within the meaning of Article II, Section 29 of the Tennessee Constitution, the defendants' actions do not violate Section 29. Likewise, the District is not within the meaning of "the State" under Article II, Section 31 of the Tennessee Constitution, and the defendants' actions do not violate Section 31. The Tennessee Constitution does not prohibit the District from operating a PPO simply because such entities are also operated by private businesses. The defendants' denial of membership in Sight Care to the individual plaintiffs and the termination of their contracts with Health Partners does not violate due

process because the plaintiffs had no vested right in membership in Sight Care or Health Partners; they had only a unilateral expectation. Finally, since the defendants have articulated a rational basis for the denial of membership in the PPOs to the individual plaintiffs, the defendants' actions do not deprive the individual plaintiffs of their right to equal protection under the law. Therefore, the trial court's grant of summary judgment and injunctive relief to the plaintiffs is reversed. Under the undisputed facts, summary judgment must be granted in favor of the defendants.

The decision of the trial court is reversed and remanded for further proceedings consistent with this Opinion. Costs on appeal are taxed to Appellees, for which execution may issue, if necessary.

_____
**HOLLY KIRBY LILLARD, J.**

**CONCUR:**

_____
**W. FRANK CRAWFORD, P. J., W.S.**

_____
**ALAN E. HIGHERS, J.**