# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
November 18, 2010 Session

## GEORGETTE MARIE BARGMANN v. KURT ALAN BARGMANN

**Appeal from the Circuit Court for Davidson County**
**No. 08D-283    Carol Soloman, Judge**

---

### No. M2010-00096-COA-R3-CV - Filed March 22, 2011

---

In this divorce action, Mother appeals the trial court's permanent parenting plan, residential schedule, child support determination, and division of marital property and debt. We affirm the designation of Father as primary residential parent; modify the residential schedule and award of unpaid child support; and vacate the "paramour provision" in the parenting plan and the "equalization payment" from Mother to Father. In all other respects, we affirm the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part, Vacated in Part, Modified in Part; Case Remanded**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which PATRICIA J. COTTRELL, P.J., M.S., and ANDY D. BENNETT, J., joined.

Jon S. Jablonski, Nashville, Tennessee, for the appellant, Georgette Marie Bargmann.

John D. Schwalb, Franklin, Tennessee, for the appellee, Kurt Alan Bargmann.

## OPINION

### I.  Factual and Procedural History

Georgette Marie Bargmann ("Mother") and Kurt Alan Bargmann ("Father") were married on July 16, 1994. Two children were born of the marriage—Madyson and Masson. In June 2006, Mother, Father, and Madyson moved to Tennessee as a result of Mother's job change; Masson, who suffers from cerebral palsy, stayed with his paternal grandparents in

Leroy, Illinois. Mother and Father separated in January 2008, and Father and Madyson moved back to Illinois to live with his parents.[1]

On January 30, 2008, Mother filed a Complaint for Divorce and on June 11 Mother filed an amended complaint with a proposed parenting plan.[2] On August 27, 2008, Mother moved for a default judgment, for *pendite lite* visitation and phone contact, and to compel Father to respond to her discovery requests. Father filed a Motion for *Pendente Lite* Support on August 29, 2008, alleging that Mother, although employed, had failed to provide him any support since he and Madyson left Tennessee. On September 12, 2008, Father filed a Statement of Income and Expenses and answered the amended complaint, requesting the divorce be granted on the grounds of irreconcilable differences and that he be designated as the children's primary residential parent.

The trial court entered an Order on the parties' motions for visitation *pendente lite* and child support *pendente lite* on October 15, 2008. With respect to visitation, the court held:

> 2. The parties are to meet at the McDonald's Restaurant located at 2603 W. Deyoung Street, Marion, IL 62959, to exchange the parties' daughter for visitation with her mother one time per month, the weekend to be chosen by Mother; the parties will meet at 8:00 p.m. on Friday and will meet for the return at 4:00 p.m. on Sunday; if Mother is off from work on the Monday of the child's three day weekend from school, she is entitled to keep the child until 4:00 p.m. on Monday on those weekends . . .
> 3. Any visitation with the parties' son will be in LeRoy, Illinois.

The court ordered Mother to pay interim child support in the amount of $776.00 per month. On September 10, 2009, the court entered an Agreed Order restraining Father from having any contact with Mother.[3]

---

[1] Father and Madyson initially moved in with Father's parents, Tom and Donna Bargmann ("paternal grandparents"), but Father was displaced after flooding occurred in the basement of the home in September 2010. At the time of trial, Madyson and Masson were living with their paternal grandparents, and Father had rented an apartment nearby.

[2] Mother's proposed parenting plan named Father as the primary residential parent and set a residential schedule giving Mother 52 days per year with the children. On May 1, 2009, Mother filed a new proposed parenting plan which named her as Madyson's primary residential parent and proposed a residential schedule giving her 307 days per year with her daughter.

[3] The restraining order was entered after Father's physician contacted Mother to disclose that Father had made a threat of bodily harm against her. Specifically, the physician faxed a note to Mother's counsel

(continued...)

A trial was held October 5, 2009, at which the parties stipulated to the grounds for divorce. Both Madyson and Masson, who were twelve and fourteen years old, respectively, testified they would prefer to live with their Father; the parties presented evidence regarding their debt and marital property. In the Final Decree of Divorce entered December 11, 2009, the trial court awarded the parties a divorce on the grounds of inappropriate marital conduct, divided marital property, adopted a permanent parenting plan, and awarded Father $6,120 in unpaid child support.[4]

The parenting plan designated Father as the primary residential parent of both children. The residential schedule gave Mother 59 days per year with Madyson and no days with Masson.[5] Mother's parenting time was scheduled as follows:

> From Friday at 6:00 p.m. to Sunday at 6:00 p.m. One weekend of every month—Mother is to choose which weekend and shall give [ ] at least 30 days notice to the Father via email. Mother shall not chose such weekend in a manner that would provide her all of the holiday weekends . . . . Weekend residential time, except that which occurs over the summer shall occur in LeRoy, Illinois or a surrounding community.

The parenting plan also included the following "special provision": "The mother shall not permit her boyfriend or any other person to whom she is not married but romantically involved to spend the night during her exercise of residential time. Neither party is to smoke in the car or house while Madyson is present."

The court divided the marital property as follows: each party retained their respective retirement accounts, the personal property in their possession, and checking and savings

---

[3](...continued)
which stated, "I advised her that Kurt Bargmann voice [sic] desire to hurt/kill her. But states he won't go to Tennessee to do this. Advised her should she see him she should not engage him in confrontation /conversation."

[4] The Final Decree contained no written findings of fact; however, the decree incorporated that portion of the trial transcript which contained the court's ruling.

[5] With regard to Mother's parenting time with Masson, the court, in footnote one of the parenting plan, stated:

> Masson is handicapped. Mother has not exercised residential time with Masson in over two years and the Court will not require him to exercise time with his mother but would encourage the father to at the very least to have telephone contact with his mother so that it is possible in the future that this relationship may be salvaged.

accounts in their individual names; Mother received her wedding dress and pearls. Regarding the marital home, the court held:

> 5.      Division of unknown debt on house:
>
> The Court has no way of knowing the ultimate outstanding obligation of this once the foreclosure process runs its' course. Based upon the very limited means of the parties it is evident that such will likely result in a bankruptcy proceeding on behalf of one or both of the parties and therefore each will remain jointly liable on any debt that may result from the deficiency. Their liability may likewise be discharged in whole or in part in the bankruptcy proceedings and such liability is specifically declared by this Court not to be a domestic support obligation that would otherwise prevent it from being discharged in a proceeding under the United States Bankruptcy Code.

With respect to marital debt, the court held: Mother was to be responsible for her 2008 income taxes, two credit cards, the deficiency on her automobile, "any taxes owed by her for the tax year 2008 that may have resulted from [Father] filing separately and claiming the children," and was to pay Father $1,883.00 "to equalize the property and debt settlement."

> On appeal, Mother presents five issues for our review:
>
> I.       Whether the court properly decided issues relating to the parenting plan for Madyson.
> II.      Whether the court abused its discretion in ordering the limitations that were placed on Mother's residential time with the child without a showing that the limitations were necessitated by the child's best interest.
> III.     Whether the court abused its discretion in requiring the monthly visits between Madyson and her Mother to occur in Leroy, Illinois.
> IV.      Whether the court erred in awarding a judgment for unpaid child support in the amount of $6,1200.00.
> V.       Whether the court erred in the equitable division of the parties' personal property and debt.

## II. Analysis

### 1. Designation of Primary Residential Parent

"Trial courts have broad discretion in devising permanent parenting plans and designating the primary residential parent." *Burton v. Burton*, No.E2007-02904-COA-R3-CV, 2009 WL 302301, at *2 (Tenn. Ct. App. Feb. 9, 2009). Because decisions regarding parental responsibility often hinge on subtle factors, such as the parent's demeanor and credibility during the proceedings, appellate courts are reluctant to second-guess a trial court's parenting schedule determinations. *Parker v. Parker*, 986 S.W.2d 577, 563 (Tenn. 1999); *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997). Consequently, a trial court's decision regarding a permanent parenting plan will be set aside only when it "falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001). It is not the role of the appellate courts to "tweak [parenting plans] . . . in the hopes of achieving a more reasonable result than the trial court." *Id.*

We review the trial court's factual findings *de novo* upon the record, accompanied by a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). When the trial court makes no specific findings of fact, we review the record to determine where the preponderance of the evidence lies. *Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997). Accordingly, we will not disturb the parenting plan fashioned by the trial court unless that decision is based on a material error of law or the evidence preponderates against it. *Adelsperger*, 970 S.W.2d at 485.

In making parenting decisions, the paramount concern of the trial court must be the welfare and the best interest of the children. *See* Tenn. Code Ann. § 36-6-401(a). Tenn. Code Ann. § 36-6-404(b) sets forth fifteen factors and a sixteenth discretionary catch-all provision a court is to consider when determining who should be designated the primary residential parent and in the determination of residential parenting time. *See Bryant v. Bryant*, No. M2007-02386-COA-R3-CV, 2008 WL 4254364, at *5–6 (Tenn. Ct. App. Sept. 16, 2008) ("Tenn. Code Ann. § 36-4-404(a) applies to divorce actions involving minor children occurring after July 1, 1997 . . ."). In this case, the trial court relied upon the statutory factors enumerated in Tenn. Code Ann. § 36-6-106(a). While there is little substantive difference between the two sets of factors, our analysis will be based upon Tenn. Code Ann. § 36-6-404. *See Cain v. Cain*, No. M2006-02250-COA-R3-CV, 2008 WL 2165963, at *6 (Tenn. Ct. App. May 16, 2008); *see also Gervais v. Gervais*, M2005-01483-COA-R3-CV, 2006 WL 3258228, at *7 n.9 (Tenn. Ct. App. Nov. 9, 2006) (commenting that

many of the factors in the two statutes are "identical" and that there was no issue in that case requiring "reconciliation of any difference").

The trial court named Father as the primary residential parent of the two children and stated the following as a basis for its ruling:

> The emotional ties are very clear between Mr. Bargmann and the children. More than that, also, between [Madyson] and [Masson] and between the whole family unit. He's very active in the children's lives. He depends deeply on his parents' assistance but he does take them to the doctors and the dentists and attends the conferences. He's doing well with two children that have some problems. . . .
> The stability of the family unit, and there's no question about it, goes in Mr. Bargmann's favor. . . . He has his parents, himself, and the children, and mother has a boyfriend.
> . . . The Court must look at the length of time the child has lived in a stable, satisfactory environment. I find Mr. Bargmann's environment very satisfactory, very stable and to disrupt it at this time would be unconscionable.
> The father has provided the food, care, medical care, education. The mother went eight months without providing any support for the children.
> . . . [T]he reasonable preferences of the child 12 years of age or older applies also in this case.

Mother contends that the court "awarded *de facto* custody" to the children's paternal grandparents by naming Father as Madyson's primary residential parent, and that the court's decision infringed on her superior right of custody as between a parent and a third party. We disagree.

Father testified that he and the children had lived with his parents, but were displaced after flooding occurred in the basement of his parents' home. Rather than disrupting the children's sleeping arrangements, Father decided to rent an apartment for himself. Father testified that he sees the children "every day" and that he sleeps on the couch at his parents home on the weekends. According to Father he "lives" with his parents, but he "sleeps somewhere else." The availability of support from the children's paternal grandparents is not a factor weighing against Father's designation as the primary residential parent and does not constitute the grant of custody to the grandparents. To the contrary, the court is specifically directed to consider the "child's interaction and interrelationships with siblings and with significant adults, as well as the child's involvement with the child's physical surroundings, school, or other significant activities" when determining the primary residential parent and residential schedule. *See* Tenn. Code Ann. § 36-6-404(b)(10).

We have reviewed the record and have determined that the evidence does not preponderate against the trial court's factual findings with respect to the emotional ties between Father and the children, nor does it preponderate against the finding that he has taken a greater responsibility for performing parental responsibilities.[6] *See* Tenn. Code Ann. § 36-6-404(b)(6)–(8). Therefore, we affirm the trial court's designation of Father as the primary residential parent.

### 2. Paramour Provision

Mother contends that the trial court abused its discretion by including a paramour provision in the permanent parenting plan *sua sponte*. Specifically, Mother insists there is no evidence in the record to support the inclusion of such a restriction on her parenting time.

The testimony related to Mother's paramour is as follows:

Q: And where are you presently living?
[MOTHER]: In Murfreesboro in a four-bedroom house, two-and-a-half baths.
Q: And who do you live with?
[MOTHER]: I live with - my roommate is currently a boyfriend.
. . .
Q: And when Madison would come to visit, would he move out for the weekend?
[MOTHER]: He spends the weekends in a hotel.
. . .
Q: Ms. Bargmann, wouldn't you agree that exposing her - I mean [Madyson] is bright enough to know that you're married to Dad and Dad is married to you, isn't she?
[MOTHER]: Yes
Q: Wouldn't you agree that it confuses her when you expose her to your boyfriend?
[MOTHER]: I didn't expose her for the first few months and we did small things. And I have friends and I don't understand why I can't have friends.
Q: She knows it's your boyfriend, doesn't she?
THE COURT: Do you know you're married?
[MOTHER]: Yes, Your Honor.
THE COURT: And she's a little girl.

---

[6] Regarding credibility, the trial court stated: "I find Mr. Bargmann to be an extremely honest witness and that credibility carried him very far."

-7-

With respect to the paramour provision, the court stated:

> [Mother's] having an affair with a man she's not married to and living with and she has taken the minor child, [Madyson], a girl child, around this situation, which the Court finds very upsetting. Upsetting because it's amoral but, more than that, because it sets a pattern for the girl to follow. The mother is the role model and that's not appropriate.
>
> . . .
>
> . . . if he's not married he'd better not be in that house. He'd better not be spending the night.

On its own initiative, the court directed that the following provision be included as part of the permanent parenting plan: "The mother shall not permit her boyfriend or any other person to whom she is not married but romantically involved to spend the night during her exercise of residential time. Neither party is to smoke in the car or house while Madyson is present."

While the court is empowered with broad discretion in determining custody and visitation matters, *see Eldridge v. Eldridge*, 42 S.W.3d 82 (Tenn. 2001), the ruling that results from the exercise of that discretion–and which we review–must be one that "might reasonably result from an application of the correct legal standards to the evidence found in the record." *Id.* at 88. Consistent with the fundamental right of a parent to the care, custody, and control of their child, *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) and to the fundamental right of non-custodial parents to visit their children, *Wix v. Wix*, No. M2000-00230-COA-R3-CV, 2001 WL 219700, at *10 (Tenn. Ct. App. Mar. 7, 2001), custody and visitation arrangements "should interfere with the parent-child relationship as little as possible." *Wix*, 2001 WL 219700, at *10.

The record does not support the restriction imposed by the court on Mother's exercise of her parenting time. Father did not make Mother's living arrangement an issue in the proceedings, and the only testimony relative to Mother's living arrangement with her boyfriend was that quoted above. Father did not include a similar provision in the proposed parenting plan he filed with the court prior to trial, nor did he request that a paramour provision be included in the parenting plan ordered by the court.[7]

---

[7] The Final Decree of Divorce contained the following statement:

. . . The Father's parenting plan which was filed with the Clerk of the Court will be adopted in modified form as shown in the contemporaneously entered Parenting Plan Order and will

(continued...)

The only rationale articulated by the trial court for including this provision was that Mother's living arrangement was "amoral" and that Mother was setting "a pattern" for Madyson to follow. As held in *Wix*, however, the "trial court's personal notions of moral rectitude are no substitute for proof of actual or threatened harm to the children." *Wix*, 2001 WL 219700, at *10. In this case, there was no proof that Madyson's physical, emotional or moral well-being was jeopardized by Mother's living arrangement.[8] While a provision of this sort might be appropriate in the initial stages of a divorce proceeding, there was no evidence in this record to suggest that a permanent restriction on Mother's exercise of her parenting time was necessary. Additionally, unlike the provision which precluded both parties from smoking in front of the children, the paramour provision applied only to Mother; we discern no reason for this limitation. Absent evidentiary justification for the limitation on Mother's parenting time, the court abused its discretion in including the paramour provision.

### 3. Location of Monthly Parenting Time

In requiring Mother to exercise parenting time in Leroy, Illinois, the trial court reasoned:

Now, there seems to be a concern that [Madyson] is missing school, skipping school. So in the parenting plan we'll say mother can come up to where [Madyson] lives once a month and will stay there, not at Mr. Bargmann's house, not at his parents' house, but she'll stay in the community. If its' a very small community, in the neighboring community, so that this child doesn't have to miss any school. So mother can come up once a month.
. . .
[I]f mother comes up there we solve the problem. Apparently the grandparents don't want to drive at night or something like that. They leave at an earlier time, whatever it is, and they get there early and feed the child and take care of it.

[7](...continued)
provide that the mother shall not have her boyfriend in the home at night during her exercise of residential time.

[8] The proof was that Mother's boyfriend was not present when Mother exercised parenting time with Madyson.

Mother contends that the trial court abused its discretion in requiring her to exercise monthly parenting time with Madyson in Leroy, Illinois. Father contends that this arrangement is in Madyson's best interest and does not constitute an abuse of discretion.

When a court is devising a parenting plan, it must focus on the needs and best interests of the children; the desires of the parents are secondary. *Boyer v. Heimermann*, 238 S.W.3d 249, 255 (Tenn. Ct. App. 2007); *Shofner v. Shofner*, 181 S.W.3d 703, 715–16 (Tenn. Ct. App. 2004). Courts must strive to create a plan that "promote[s] the development of the children's relationship with both parents and interferes as little as possible with post-divorce family decision-making." *Shofner*, 181 S.W.3d at 715.

Pending the final hearing, and pursuant to the interim Order entered October 15, 2008, Madyson was transported to Marion, Illinois to meet Mother for monthly visitation. On most occasions, Madyson's paternal grandparents would take Madyson out of school at approximately 12:30 p.m. on Fridays to make the three-hour trip to Marion. When asked why Madyson was taken out of school early, Father stated: "We take her out about 12:30 so that way [paternal grandparents] can get on the road and have time to get things settled" and allow Madyson to "have time to relax before she has to go for another three hours in the other direction."

In requiring Mother to exercise parenting time in Leroy, Illinois, the trial court improperly emphasized the convenience of the paternal grandparents. While we share the court's concern that Madyson was being taken out of school early to meet her Mother, and we agree that her best interests are not advanced when she misses school, the evidence shows that exercising parenting time in compliance with the *pendente lite* order did not necessitate Madyson's absence from school. The drive from Leroy to Marion, Illinois is approximately three and one-half hours, a distance that does not require Madyson to miss school for purposes of traveling. It is not inappropriate for Father to seek the assistance of the paternal grandparents in facilitating Madyson's transportation to Marion, but the traveling preferences of the grandparents should not dictate where Mother must exercise parenting time.

Because the evidence preponderates against the trial court's findings regarding Madyson's absences from school, we vacate the trial court's requirement that, "[w]eekend residential time, except that which occurs over the summer shall occur in LeRoy, Illinois or a surrounding community," and we reinstate the requirement in the interim Order which provides that "[t]he parties are to meet at the McDonald's Restaurant located at 2603 W.

Deyoung Street, Marion, IL 62959, to exchange the parties' daughter for visitation with her mother one time per month."[9]

### 4. Child Support

Mother contends that the trial court erred in awarding Father a judgment for $6,120.00, representing eight months in unpaid child support; she contends that the parties had an agreement that she would not be expected to pay support to Father. In addition she contends that the period she did not pay support was actually seven months.

Mother introduced a letter from Father which she testified confirmed the agreement that she would not pay support. There was very little testimony regarding the circumstances leading to the agreement and the particulars of the letter,[10] which was prepared by Father when the parties separated. In the letter, Father attempts to set out a division of property and make some provision for visitation with and medical expenses for the children.

A parent's obligation to support their child exists in the absence of a court order. *Dep't. of Children's Servs. v. Culbertson*, 152 S.W.3d 513 (Tenn. Ct. App. 2004); *Kirkpatrick v. O'Neal*, 197 S.W.3d 674 (Tenn. 2004). The fact that there was no order of support at the time the letter was prepared does not relieve Mother of the legal obligation that she support Madyson and Masson. There is no evidence in the record that Mother was meeting her legal obligation to support the children prior to the entry of the *pendente lite* order on October 15, 1008. While support can be provided in different ways, the agreement is not effective to relieve Mother of her legal duty in the absence of substantial evidence regarding how the agreement satisfied her support obligation.

The trial court based its award on a finding that Mother had not paid support for eight months. In his brief on appeal, Father acknowledges that the period was actually seven months. Consequently, we modify the trial court's award for unpaid child support and award Father $5,432.00 in unpaid child support.

---

[9] We are confident that Father can work out the logistics of transporting Madyson to Marion so as not to interfere with her schooling.

[10] Mother testified only that the letter was written in January 2008 and that it confirmed her agreement that Madyson live with Father. There was no testimony from Father regarding the letter.

**5. Division of Personal Property and Debt**

Mother argues that the trial court inappropriately divided the parties' property and debt. Specifically, Mother requests this court to "vacate the equalization payment from [Mrs.] Bargmann to [Mr.] Bargmann and modify that payment to require Mr.Bargmann to pay an equalization payment to Mrs. Bargmann in the amount of $9,100.08."

With respect to the division of the marital estate, the Final Decree of Divorce stated as follows:

a.      Each party shall retain their retirement accounts.

b.      Each party shall retain the personal property in their possession. Mr. Bargmann is award [sic] the 1998 GMC Jimmy in his possession.

c.      Ms. Bargmann shall be responsible for her 2008 income taxes, the Capital One credit card, the WalMart Credit Card and the deficiency resulting from the surrender of her automobile. Mr. Bargmann is responsible for the Sam's Club Credit Card.

d.      Ms. Bargmann shall be responsible for any taxes owed by her for the tax year 2008 that may have resulted from Mr. Bargmann filing separately and claiming the children.

e.      Each party is awarded the checking and savings accounts in their individual names.

f.      Ms. Bargmann shall pay to Mr. Bargmann the sum of $1,883.00[11] to equalize the property and debt settlement.

g.      Ms. Bargmann if [sic] further awarded her wedding dress and pearls.

*A. Classification and Valuation of Marital Property*

The division of the parties' marital estate begins with the classification of the property as separate or marital property. *Miller v. Miller*, 81 S.W.3d 771, 775 (Tenn. Ct. App. 2001). Once property has been classified as marital property, the court should place a reasonable value on property that is subject to division. *Edmisten v. Edmisten*, No. M2001-00081-COA-R3-CV, 2003 WL 21077990, at *11 (Tenn. Ct. App. May 13, 2003). The parties have the burden to provide competent valuation evidence. *Kinard v. Kinard*, 986 S.W.2d 220, 231 (Tenn. Ct. App. 1998). Our review of the record indicates that the trial court mistakenly

---

[11] At the time of the hearing the amount of the difference resulting in this amount was $2366.00 based upon the Husband's retirement account value of $5017.24 as shown on the Wife's statement of marital property. The actual value as shown on exhibit A to this Final Decree was $5982.40 and the Wife is given credit for one half of the difference resulting in this revised amount in round numbers. (footnote in original).

classified Mother's wedding dress and pearls and Father's 1998 GMC Jimmy as marital property. In addition, the trial court failed to consider Father's $8,000 tax refund as part of the marital estate.

Pursuant to Tenn. Code Ann. § 36-4-121(b)(2)(D), property acquired by gift is separate property and should not be divided. Mother testified that her pearls, which were in Father's possession at the time of trial, were "purchased by my parents when I was a baby; appraised in 1989 for $2,700." The pearls and wedding dress were Mother's separate property not subject to division in the marital estate. With respect to Father's vehicle, Mother testified that it is paid in full and that, "[h]is parents gave it to him when we moved to Tennessee." There was no countervailing evidence regarding the vehicle, consequently, the trial court should have classified the 1998 GMC Jimmy as Father's separate property. In addition, the evidence supports Mother's contention that Father's 2008 tax refund in the amount of $8,000.00 is marital property subject to division by the trial court.[12]

Thus, the marital property available for division and the value of the property established by the record is:

Household furniture and personal property taken by Father
Household furniture and personal property retained by Mother
Mother's retirement account: $12,697.01
Father's retirement account: $5,982.40

---

[12] With respect to his tax refund, Father testified as follows:

Q: Did you file taxes in 2008?
A: Yes.
Q: Did you get a refund?
A: Yes.
Q: How much refund did you get?
A: It was eight.
Q: Eight what?
A: Thousand.
Q: $8,000?
A: Yes.
Q: And did you send any of that to Mrs. Bargmann?
A: No.
Q: But it was money earned during the marriage?
A: Uh-
Q: You're still married so it had to be money earned during the marriage.
A: Okay.

Marital residence
Mother's checking account: $500.00
Mother's savings account: $3,700.00
Father's checking account: $673.50[13]
Father's savings account: $401.33
Father's tax refund: $8,000.00

Total marital estate: $31,954.24[14]

*B. Classification and Valuation of Marital Debt*

The record confirms that the debts incurred by the parties during the course of the marriage and up to the date of the final divorce hearing were properly classified as marital debts. The evidence showed that the credit card debt was incurred for a family purpose[15] and that neither party charged anything on the credit cards after Father moved back to Illinois in January 2008. The marital debt for valuation and division included the following:

Capital One Credit Card: $4,139.98
Sam's Credit Card: $0.00[16]
Wal-Mart Credit Card: $1,474.41
Mother's 2008 Income Tax: $1,300.00

---

[13] Father did not bring current information detailing the balance of his savings and checking accounts, however, Mother submitted evidence of Father's bank account balances as of June 13, 2008.

[14] Neither party submitted evidence of the value of the furniture and personal property and neither party contests the trial court's award of furniture and personal property on appeal.

[15] With respect to the purpose of the credit card debt, Mother testified as follows:

Q: So how did the $4,000 get on the Capital One Card and $1500 or $2000 on the Wal-Mart card?
A: There was a lot of gas charges; Mr. Bargmann smoked cigarettes and that cost quite a little bit of money.
Q: He didn't smoke $5000 in cigarettes in one year, did he?
A: No, but we purchased groceries, we purchased clothing items.
Q: So every day living expenses?
A: Yes.
Q: The bottom line is you were living beyond your means?
A: Yes.

[16] Father testified that there was no outstanding balance on the Sam's Club credit card.

Mother's Automobile Deficiency: $7,832.80
Loan against Mother's retirement account: $3,292.75
Total marital debt: $18,039.94

### C. Division of Marital Estate

Once the marital property has been valued, the trial court is to divide the marital property in an equitable manner. Tenn. Code Ann. § 36-4-121(a)(1); *Miller*, 81 S.W.3d at 775. Dividing a marital estate is not a mechanical process but rather is guided by considering the factors in Tenn. Code Ann. § 36-4-121(c). *Kinard*, 986 S.W.2d at 230. A division of marital property in an equitable manner does not require that the property be divided equally. *Robertson v. Robertson*, 76 S.W.3d 337, 341 (Tenn. 2002). Likewise, all debts "incurred by either or both spouses during the course of marriage up to the date of the final divorce hearing" must be divided equitably. *Alford v. Alford*, 120 S.W.3d 810, 813 (Tenn. 2003). When dividing marital debt, the court should consider: "(1) the debt's purpose; (2) which party incurred the debt; (3) which party benefitted from incurring the debt; and (4) which party is best able to repay the debt." *Id.* (citing *Mondelli v. Howard*, 780 S.W.2d 769, 733 (Tenn. Ct. App. 1989)).

As a general matter, reviewing courts will evaluate the fairness of a property division by its final results. *Owens v. Owens*, 241 S.W.3d 478, 490 (Tenn. Ct. App. 2007); *Thompson v. Thompson*, 797 S.W.2d 599, 604 (Tenn. Ct. App. 1990). Further, "unless the court's decision is contrary to the preponderance of the evidence or is based on an error of law, we will not interfere with the decision on appeal." *Sullivan v. Sullivan*, 107 S.W.3d 507, 512 (Tenn. Ct. App. 2002) (citing *Goodman v. Goodman*, 8 S.W.3d 289, 298 (Tenn. Ct. App. 1999)). Thus, appellate courts ordinarily defer to the trial court's decision unless it is inconsistent with the factors in Tenn. Code Ann. § 36-4-121(c) or is not supported by a preponderance of the evidence. *Jolly v. Jolly*, 130 S.W.3d 783, 785–86 (Tenn. 2004).

In its division of marital property, the trial court allowed each party to retain their respective retirement accounts, the personal property in their possession, and the checking and savings accounts in their individual names; Mother received her wedding dress and pearls. The record does not show the value of the marital home; the proof was that the mortgage was several months in arrears and foreclosure proceedings had been initiated. Due to the uncertainly of the situation, the court did not divide the home or the debt on the home.

With respect to marital debt, the court ordered that Mother be responsible for her 2008 income taxes, the Capital One and Wal-Mart credit card accounts and the deficiency on her automobile, and that she was to pay Father $1,883.00 "to equalize the property and debt

settlement." Mother contends that the trial court erred by requiring an equalization payment and by assigning a larger portion of the marital debt to her.

In consideration of the record and the factors at Tenn. Code Ann. § 36-4-121(c), we have determined that the evidence preponderates against the trial court's division of the marital estate; the final result is not equitable. *See Owens*, 24 S.W.3d at 490. The final result of the trial court's property and debt division is as follows: Mother received $16,897.01 in assets and Father received $15,097.25[17]; Mother was assigned the marital debt of $18,039.94 and Father assigned none.

Applying the factors at *Mondelli v. Howard*, the record supports the trial court's assignment of greater marital debt to the Mother. Specifically, the evidence shows that Mother has the greater ability to repay the debt and, with respect to the debt on her automobile and retirement account, she received the benefit of the debt incurred. Mother's monthly income was substantially more than Father's and she maintained two bank accounts with balances totaling $4,200.00 as of the date of trial.

The court, however, did not make findings relative to its belief that the division of marital assets or debt was not equal or equitable and gave no reasoning for its award of $1,883.00 to Father. The trial court's requirement that Mother pay Father $1,883.00 to "equalize the property and debt settlement" is not supported by a preponderance of the evidence and must be vacated.[18] *See Jolly*, 130 S.W.3d at 785–86.

---

[17]  This figure includes Father's tax refund of $8,000.00.

[18]  To the extent footnote 1 in the final decree (footnote 11, *supra*) is intended to give a rationale for the ruling, we are unable to reconcile the figures in the footnote with the statements of counsel and the court. The trial transcript reflects confusion on the part of counsel for Mother in this regard, part of which was brought about by Father's failure to have current data relative to his retirement accounts and Father's failure to provide a proposed disposition of marital property.

## III. Conclusion

For the foregoing reasons, we affirm the designation of Father as primary residential parent of both children; vacate the "paramour provision" in the parenting plan; modify the residential parenting schedule by reinstating the requirement that the parties meet at the McDonald's Restaurant located at 2603 W. Deyoung Street, Marion, IL 62959, to exchange Madyson for visitation with her mother; modify the child support arrearage due Father to $5,432.00; and vacate the $1,883.00 "equalization payment" ordered to be paid Father. In all other respects, the judgment is affirmed.

_____
RICHARD H. DINKINS, JUDGE