# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
September 17, 2013 Session

## LISA WOMBLE v. UNIVERSITY HEALTH SYSTEM, INC. d/b/a UNIVERSITY OF TENNESSEE REGIONAL MEDICAL CENTER, ET AL.

**Appeal from the Circuit Court for Knox County**
**No. 1-347-11      Dale Workman, Judge**

---

**No. E2012-02664-COA-R9-CV-FILED-JANUARY 16, 2014**

---

In the wake of her firing from the University of Tennessee Regional Medical Center in Knoxville, Tennessee, a nurse brought an employment action raising numerous claims. At the time the nurse originally began working at the medical center, it was owned and managed by the University of Tennessee and she was considered an employee of the university. In 1999, the university executed a lease and transfer agreement pursuant to Tennessee Code Annotated section 49-9-112, by which the operation of the medical center was transferred to a private, nonprofit corporation. Hospital personnel, like the nurse, who had been university employees prior to the transfer, were thereafter "leased" by the private, nonprofit corporation from the university. This interlocutory appeal stems from the trial court's sua sponte ruling that Tennessee Code Annotated section 49-9-112(a) is unconstitutional. We reverse the determination of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and THOMAS R. FRIERSON, II, JJ., joined.

Robert Cooper, Jr., Attorney General and Reporter, William E. Young, Solicitor General, and Melissa Brodhag, Assistant Attorney General, Nashville, Tennessee, for the intervenor/appellant, Robert E. Cooper, Jr., Attorney General and Reporter.

George T. Underwood, Jr., Knoxville, Tennessee, for the appellee, Lisa Womble.

Howard B. Jackson and Ronald G. Daves, Knoxville, Tennessee, for the appellee, University Health System, Inc.

**OPINION**

**I. BACKGROUND**

In 1949, the Tennessee General Assembly appropriated a percentage of the funds needed for the construction of the University of Tennessee Memorial Research Center and Hospital ("UT Hospital"). 1949 Tenn. Pub. Acts, ch. 154. The legislation provided that when completed, UT Hospital would be turned over to the University of Tennessee ("UT") for operation, specifically for use in teaching courses in health sciences and with the specific contemplation "for the care of charity patients.*" Id.* Forty-eight years later, in 1997, the legislature authorized UT's Board of Trustees to create a private, nonprofit corporation for the purpose of operating UT Hospital. *See* Tenn. Code Ann. §§ 49-9-1301, et seq. The 1997 legislation provides as follows:

(a) The board of trustees is authorized to: (1) Take all steps necessary for the creation of a private nonprofit corporation under the Tennessee Nonprofit Corporation Act . . . for the purpose of operating the University of Tennessee Memorial Research Center and Hospital. . . . The corporation shall not be an agency, department or political subdivision of the state. The charter of the nonprofit corporation shall include that its purpose is to operate the University of Tennessee Memorial Research Center and Hospital in a manner that will fulfill the hospital's mission statement of dedication to its continuation as the premier center to offer medical care to the underserved population of the thirteen county area served by the hospital.

\* \* \*

(3) With prior approval of the attorney general and reporter and with prior approval of the state building commission in consultation with the majority and minority leaders of both houses of the general assembly, **transfer to a corporation created under this section any or all assets used in or related to operation of the University of Tennessee Memorial Research Center and Hospital on such terms and conditions as the trustees deem in the best interest of the university and state**; provided, however, that the trustees shall take action to provide for continued support of the education and research missions of the university in the health sciences, including, but not limited to, access to facilities that will offer clinical experience for students in the health sciences.

**(b)(1)  Debts or other obligations of a corporation created under this**

**section shall be payable only from the assets of the corporation and shall not be debts or obligations of the state. Neither the university nor the state shall have any legal or other obligation to finance the deficits of, or provide financial support to, the corporation**. . . .

(Emphasis in bold added.). The statute clearly provides that the nonprofit corporation is not a state entity. It has been observed that the legislation's goal was "to divest the state of interest in UT [Hospital], allowing the hospital flexibility in charting its future course, including future transactions with other entities, while at the same time guaranteeing the state a return on its investment and veto power over any transaction it believes contravenes the public interest." "Conversions of Nonprofit Hospitals to For-Profit Status: The Tennessee Experience," 28 U. Mem. L. Rev. 1077, 1124 n. 251 (1998). University Health System, Inc. ("UHS") is the nonprofit corporation created pursuant to Tennessee Code Annotated section 49-9-1301(a) to operate UT Hospital.[1]

Tennessee Code Annotated section 49-9-1304 was passed by the legislature in 1997 as the original UT Hospital Employee "transition" plan:

(a) In carrying out any transfer of the [UT] Hospital under this part, **the board of trustees shall make reasonable efforts to provide for the transition of employees from the state to non-state employment** in an orderly and equitable manner.

(b) With respect to employees previously employed by the [UT] Hospital, the private nonprofit hospital created pursuant to this part shall provide:

(1) A defined insurance and leave benefits package that is equivalent to or better than the benefits package previously enjoyed by employees of the [UT] Hospital; and

(2) A deferred compensation program and a defined fixed-benefits

---

[1]"Nonprofit corporations generally are recognized to be public or charitable in nature." *State ex rel Boone v. Sundquist*, 884 S.W.2d 438, 444 (Tenn. 1994). A basic distinction between for profit and nonprofit entities is the possibility of private enrichment. Thus, "[i]n general terms, a nonprofit enterprise is an organization in which no part of the income is distributable to its members, directors or officers. . . ." Ronald Lee Gilman, Tennessee Corporations § 11B-1 (2001). See "Developments in the Law – Nonprofit Corporations," 105 Harv. L. Rev. 1578, 1582 (May 1992). There is no prohibition on a nonprofit corporation conducting enterprises for income or from accumulating earnings. However, such revenues must be used for the purposes set forth in the charter and there must be no pecuniary gain to the incorporators or members, and no distribution of income or profits to them. 1 Fletcher Cyclopedia of the Law of Corporations § 68.05.

retirement plan that is equivalent to or better than the deferred compensation program and retirement plan available to participants within the Tennessee consolidated retirement system.

(c) Any person employed by the [UT] Hospital on June 13, 1997, shall continue to be eligible for the same tuition reduction authorized to any other employee of [UT] to the same extent the person was entitled to receive tuition reduction while employed by the [UT] Hospital as long as that person remains an employee of the private nonprofit hospital created pursuant to this part.

(d) For those employees employed by the [UT] Hospital, it is the legislative intent that the private nonprofit hospital created pursuant to this part shall provide compensation at least equivalent to their current compensation and shall make reasonable allowance for their accumulated benefits (i.e., sick leave, vacation, educational benefits, etc.) that the employees were eligible for at the time of the transfer.

(e) With respect to employees previously employed by the [UT] Hospital, **the private nonprofit hospital created pursuant to this part shall only impose personnel terminations, layoffs, suspensions or demotions for cause and shall provide affected employees with due process rights and procedures that the employees previously enjoyed as employees of the [UT] Hospital**.

(Emphasis in bold added.).  A year later, however, the legislature enacted the statute that is at issue herein, Tennessee Code Annotated section 49-9-112:

(a)  The University of Tennessee is expressly authorized to lease employees to any nonprofit corporation created under Tennessee law for the purpose of operating a hospital with which the university is affiliated through its medical education programs.  **Employees leased under the authority of this section shall remain eligible for all university benefits for which they are otherwise eligible and shall be subject to termination, layoff, suspension or demotion only in accordance with university personnel policies and procedures**.

Tenn. Code Ann. § 49-9-112(a) (emphasis in bold added).  Pursuant to this legislation, UHS "leased" the UT  Hospital employees ("UT Hospital Employees") working at the hospital prior to the transfer effective as of the date operation of UT Hospital was turned over to UHS.  The terms of the statute are implemented by an Employee Services Agreement ("the ESA"). The following sections of the ESA are pertinent in this appeal:

-4-

1.4 <u>Personnel Policies and Procedures</u>. The following personnel policies will be applied: (a) As described in Tenn. Code Ann. § 49-9-112, and only to the extent required therein, **UT Hospital Employees shall be subject to termination,** layoff (reduction in force), suspension, or demotion **only in accordance with the UT Personnel Policies and Procedures, as administered by UHS**; (b) Subject to the preceding <u>Section 1.4(a)</u>, each UHS Employee and **UT Hospital Employee will be an at-will employee, and may be terminated at any time**, subject to the provisions of any applicable federal, state and local laws. After Closing [on July 29, 1999], UHS will be solely responsible for all aspects of supervision and control (including, but not limited to, salary, shift, call and overtime) of all UT Hospital Employees and UHS Employees and will exclusively administrate its own comprehensive personnel system (including, but not limited to, its own non-discrimination and affirmative action plan and its own travel and reimbursement policy). Except as provided in this <u>Section 1.4</u>, UT and UT Personnel Policies and Procedures will have no jurisdiction or authority over the Hospital, UT Hospital Employees or UHS Employees, other than the responsibility of UHS to faithfully administrate the UT Personnel Policies and Procedures for UT Hospital Employees with regard to termination, layoffs, suspension and demotion. UHS shall, at all times, retain the right to control and direct each UT Hospital Employee, not only as to the result to be accomplished by the work, but also as to the task and means by which that result is to be accomplished. UHS shall, at all times, have the right to direct the time and the place where services shall be performed by UT Hospital Employees, and (c) subject to <u>Section 1.4(a)</u>, UT may apply its UT Personnel Policies and Procedures to collect debts and obligations owed to it by UT Hospital Employees or funds subject to garnishment. UT shall have no obligation to apply its policies and procedures to collect debts owed by UT Hospital Employees to UHS.

* * *

2.1 <u>Payment for Services</u>. As consideration for the provision of services by the UT Hospital Employees, UHS shall be responsible for the UT Costs . . . paid or incurred by UT with respect to the UT Hospital Employees.

* * *

2.3 <u>UT Costs</u>. "UT Costs" shall mean all actual sums of money (other than Excluded Liabilities) incurred or expended by or on behalf of UT . . . on: (a)

wages and salaries paid to UT Hospital Employees for the services provided under this Agreement; (b) federal, state and local taxes paid on the amounts described in (a); (c) the required contributions on behalf of UT Hospital Employees under UT Retirement Plans, 401(k) match plan, group health insurance, and life insurance plans with respect to the amounts described in (a); (d) amounts paid for unemployment insurance as required by Tennessee law with respect to the amounts described in (a); . . . (g) cost of fee waivers and discounts for UT Hospital Employees, spouses and dependents at non-UT institutions; . . . and (i) any other direct expense . . . relating to UT Hospital Employees not otherwise specified in this Agreement. . . .

2.4 <u>Excluded Liabilities</u>. The following amounts . . . shall be excluded from UT Costs and will remain the responsibility of UT:

\* \* \*

    2.4.2 <u>Benefits</u>. Obligations with respect to any UT Hospital Employee . . . for: (a) any payments or liability under any UT Retirement Plans . . . .

\* \* \*

9.4. <u>Liability With Respect to UT Hospital Employees</u>. UT Hospital Employees performing services under this Agreement are "loaned servants" of UHS. ***Respondeat superior* liability for the acts and omissions of UHS Employees and the acts and omissions of UT Hospital Employees on or after Closing shall lie solely with UHS**. All workers' compensation liability for occurrences on or after Closing with respect to UT Hospital Employees shall lie solely with UHS. At all times during the Term of this Agreement, and at its expense, UHS shall provide workers' compensation insurance for UT Hospital Employees in accordance with applicable Tennessee law.

9.5 <u>Protection For UT Hospital Employees</u>. UT and UHS understand and agree that **in performing services under this Agreement, the UT Hospital Employees are state employees "employed in the service of the state" and their "compensation is payable by the state" within the meaning of Tenn. Code Ann. § 8-42-101(3)(A)[2] and Tenn. Code Ann. § 8-34-101(18).[3]**

_____

[2]In regard to legal representation, section 101(3)(A) "'State employee' means any person who is a
(continued...)

-6-

**Therefore, UT and UHS understand and agree that the UT Hospital Employees remain eligible to participate in the UT Retirement Plans and other UT Benefit Plans and remain eligible to raise the absolute immunity defense provided in Tenn. Code Ann. § 9-8-307(h) against individual or personal liability for acts or omissions within the scope of their employment.** Notwithstanding the above, UT and UHS agree that all *respondeat superior* liability for the acts and omissions of the UT Hospital Employees lies solely with UHS, which will exercise exclusive direction and control over the performance of services by UT Hospital Employees under this Agreement. UHS shall indemnify, defend, and hold harmless UT Hospital Employees against all individual or personal liability for Damages arising out of, attributed to, or in connection with, any act or omission of a UT Hospital Employee in the performance of services under this Agreement, except for willful, malicious, or criminal acts or omissions, or for acts of omissions done for personal gain.

9.6 <u>Indemnification of UT, State and UT and State Employees</u>. (a) UHS shall indemnify, defend, and hold harmless UT, the State, and their agents, trustees, officers, employees, and successors against all Damages in any way arising out of, attributable to, or in connection with: (1) the Existing Facility Operations before, on or after Closing; (2) any act or omission of a UHS Employee or a UT Hospital Employee after the Closing regardless of whether the act or omission relates to the Existing Facility Operations; or (3) any act or omission of a UHS Employee or a UT Hospital Employee before the Closing only if the act or omission relates to the Existing Facility Operations. Without limiting the generality and scope of the preceding sentence, the obligations of UHS under this <u>Section 9.6</u> shall include, without limitation, the following liabilities: Prior Legal Liabilities, tort liability, worker's compensation liability, premises liability, environmental liability, professional liability, malpractice liability, employment discrimination liability, civil rights liability and liability for breach of any constitution, statutory, common law or

---

[2](...continued)
state official . . . or any person who is employed in the service of and whose "compensation is payable by the state, or any person who is employed by the state whose compensation is paid in whole or in part from federal funds . . . ."

[3]For retirement purposes, section 101 (18) "'General employee' means any person who is a state official . . . or who is employed in the service of, and whose compensation is payable in whole or in part by, the state, including employees under supervision of the state whose compensation is paid, in whole or in part, from federal or other funds . . . ."

contractual duty. Notwithstanding any provision herein to the contrary, the indemnification and hold harmless obligations of UHS under this Article 9 with respect to a claim filed under the Tennessee Claims Commission Act for Damages arising out of, attributable to, or in connection with, an occurrence before Closing, and for which jurisdiction lies under the Tennessee Claims Commission Act, shall be limited to the monetary limits of liability established by the Tennessee Claims Commission Act. The indemnification and hold harmless obligation of UHS under this Article 9 shall be construed as an obligation to pay Damages and not merely as an obligation to reimburse UT, the State and their agents, trustees, officers, employees and successors for Damages paid by them. The obligations of UHS under this Article 9 shall not be deemed or construed to waive or abrogate in any way the sovereign immunity of UT, the State, or any officer or employee of UT or the State.

(Emphasis in bold added.).

Lisa Womble had been employed as a nurse at UT Hospital since July 13, 1988. She became a leased employee of UHS on July 8, 1999.

Womble's record contains alleged performance deficiencies. In February 2010, Womble could not be located at UT Hospital for four hours. She was ultimately found locked in a bathroom lying on the floor with her cell phone disabled. In a meeting the next day, it is alleged she made unusual statements to UHS management about UT storing weapons on the premises. Thereafter, she was placed on medical leave. Womble returned to work at UT Hospital in late March 2010, at which time she was instructed to not abandon her work in the future. In April and May 2010, however, UHS purportedly continued to discern performance issues, such as Womble pre-charting procedures and events before they were actually done; taking a patient to the wrong operating room; placing a D & C specimen in view of the patient from whom the specimen came; and opening latex gloves in a sterile environment before knowing whether the patient had a latex allergy. Womble disputes the alleged "facts" surrounding these incidents and asserts the charges were a pretext for her firing. In May 2010, Womble received a written warning and was placed on probation. By the end of June 2010, UHS management learned of Womble's involvement in an incorrect sponge and needle count. Furthermore, according to UHS, it had received unsolicited statements from eight different registered nurses and surgical technicians outlining concerns over Womble's conduct and performance. Three UHS members of management met and determined that Womble should be terminated.

With regard to discharge of a non-exempt employee, UT policy provides, among other things, that: (1) there be a pre-discharge meeting wherein the employee is told of the

reason(s) for the proposed action and given an opportunity to respond; and (2) such employees may request a post-discharge hearing conducted under the contested case provisions of the Tennessee Uniform Administrative Procedures Act ("TUAPA"), Tennessee Code Annotated section 4-5-301, et seq. On July 19, 2010, a pre-discharge meeting was held with Womble. UHS management members Gary Scott, Betty Gissel, and Thomas Fields conducted the meeting. Gissel explained that the proposed discharge action related to ongoing patient safety issues. Womble was given an opportunity to respond, but offered little to no response; the meeting form reflects the following note: "When asked if she had any questions she said "No questions, none at all." Womble later testified: "I felt defeated and there was no reason to try to communicate with them because they had already made their decision." In a deposition, Womble stated:

> A: . . . I had never been through that before. They presented this to me and I thought – I know in the 22 years I worked there that the way the policies have always worked that they have to actually – supposedly, this is my understanding of how corrective action works, is when you are corrected you are called into the office and you are given a verbal warning. When you are given a verbal warning, you are told it's a verbal warning and you have to sign a paper saying it's a verbal warning, and then that has to happen three times and then they can write you up for that specific thing. They can't write you up for four things all at one time on one piece of paper and never notify you until the day of the thing.

At the conclusion of the meeting, UHS provided Womble with her termination letter, which included the following description of Womble's rights related to challenging the termination:

> As an UT leased employee, you have the right to select from two types of hearings should you wish to appeal your termination. If you desire a hearing, you must notify the Vice President of Human Resources in writing on or before 15 working days from receipt of this letter. . . . In your letter, please state which type of hearing you are requesting. Your options are:
>
>> 1) A hearing under the provisions of the Tennessee Uniform Administrative Procedures Act (TUAPA). If you desire a TUAPA hearing, you have the right to be represented by your attorney at the hearing. UHS will also be represented by an attorney at a TUAPA hearing.
>>
>> 2) A hearing under our Complaint Resolution Policy. This

hearing is more informal and less complex but equally fair. If you elect to have this informal hearing, you will be required to sign a waiver of your right to a TUAPA hearing. Informal hearings are conducted without legal counsel.

On August 6, Womble sent a letter to Gissel, Vice President of Human Resources, requesting the TUAPA hearing.

## TUAPA HEARING

The hearing was held over a year later on September 29, 2011. Testimony was given by nine witnesses, including Womble. On March 27, 2012, the hearing officer entered an initial order upholding the discharge of Womble as justified. Relevant findings from the hearing officer are as follows:

I. <u>Ms. Womble Did Not Have a Property Interest in Her Employment</u>.

The Hearing Officer recognizes that counsel for Ms. Womble believes that Tenn. Code Ann. § 8-30-331 guarantees due process to leased employees like Ms. Womble, and therefore she could only be discharged "for cause and [provided] due process rights and procedures that are equivalent to or better than the due process rights and procedures that the employees previously enjoyed as employees of the University of Tennessee." The Hearing Officer, for reasons stated below believes that Ms. Womble was discharged for cause and was provided adequate due process.

A public employee may have a property interest in his or her employment, but that property interest is not created by the Constitution. In the instances where a public employee has a property interest in her employment, it is based on statute or contract. {*See Board of Regents v. Roth*, 408 U.S. 564, 577 (1972)} For example, if a statute gives an employee property interest in a job, then she has a definite property interest. A teacher with tenure is considered to have a property interest in her job. Ms. Womble argued that because she had been a "career state employee" that she had property interest in her job. While the Hearing Office[r] can sympathize with Ms. Womble believing that because she invested many years of her career with the Hospital that she had a legally protected property interest in her employment, she did not. Consequently, the Hospital did not have to establish that i[t] provided Ms. Womble with due process. Instead, the Hospital was required to demonstrate that Ms. Womble's

discharge was not arbitrary or capricious.

## II.  The Hospital Provided Ms. Womble with Due Process

Even though the Hospital was not required to provide due process because Ms. Womble did not have a protected property interest in her employment, UHS did provide Ms. Womble with due process.  When Ms. Womble's first serious medical incident occurred, the Hospital quickly ensured that she was able to take FMLA leave and participate in a fitness-for-duty process to ensure that she was ready to return to work.  Then, when Ms. Womble engaged in the "pre-charting" violations (which she freely admitted that she committed), she received verbal counseling.  Then, when she committed multiple violations, including:

1.  Mishandling the "D & C" specimen in front of a patient
2.  Opening non-latex-free glove into sterile field
3.  Attempting to take patient to the wrong operating room

she received a Correction Action and probation.  Even after these incidents that put her ability to manage patient safety into question, she committed more violations a month later when she failed to communicate with other staff in the operating room, and she removed a bag of used sponges from the pole in the operating room.

Ms. Womble argues that her due process rights were violated because she should have had the right to confront the people who reported her violations each time she committed [one].  The first problem with that argument is that the Hospital was not required to guarantee her due process rights.  Second, Ms. Womble admitted committing virtually every one of the violations that were reported.  Third, Ms. Womble was given the chance to respond to all charges at a pre-discharge hearing.  Finally, the purpose of the TUAPA hearing was to enable her (or her counsel) to cross-examine any witness who offered testimony against [her], which she was permitted to do.  The Hearing Office[r] finds that Ms. Womble did receive constitutionally sufficient due process.

* * *

The discharge was upheld and the order became final after fifteen days.  Womble thereafter appealed the decision to the Chancery Court for Davidson County, where, after review, the hearing officer's order upholding the discharge was affirmed and the petition was dismissed

with prejudice.

Womble filed the instant action on July 18, 2011,[4] alleging breach of contract, outrageous conduct, wrongful termination, Tennessee Human Rights Act violations (age and disability), misrepresentation, fraud, deceit, malice, and negligence against UHS and her former supervisor, Fields. The complaint included a claim pursuant to 42 U.S.C. section 1983 on the theory that UHS had denied Womble of property (her employment) without due process of law. Womble contends that UHS is "cloaked with color of state authority to stand in the shoes of the state government regarding [her] employment."

In the proceedings below, UHS moved for summary judgment on all claims. At the hearing on the motion, the trial court sua sponte raised the subject of the constitutionality of section 49-9-112(a). The trial court commented that the enabling legislation was an unconstitutional delegation of governmental authority to a private entity. At the hearing, the trial court observed inter alia as follows:

> THE COURT: . . . The way the Court sees it, if she's a loaned employee, then all you have to do is unloan [her]. . . . [G]ive [her] back to UT. It's UT's problem. . . .
>
> If she's not your employee and you are not a state entity, then none of that applies. . . .
>
> * * *
>
> MR. JACKSON: We terminated [her] . . . .
>
> THE COURT: How do you terminate a loaned employee?
>
> * * *
>
> THE COURT: . . . I think before I can go further you all are going to have to decide what is the University of Tennessee hospital. If it's a private entity and this is a loaned employee from a governmental entity, all you do with that loaned employee, if you got a loaned employee, you say we're no longer – see,

_____

[4]Additionally, on July 15, 2011, Womble filed with the Division of Claims Administration. A Commissioner entered an order of dismissal on July 5, 2012, finding that the Claims Commission lacked subject matter jurisdiction over the case. Womble appealed. We affirmed. *Womble v. State of Tennessee*, No. E2012-01711-COA-R3-CV, 2013 WL 3421925 (Tenn. Ct. App. July 3, 2013).

you go back to sue your employer. The employer didn't fire them. They are still employed by the base employer. You couldn't fire them if they are a loaned employee.

MR. JACKSON: They are not a loaned employee; they are a leased employee.

\* \* \*

MR. JACKSON: . . . [T]hat's what they have is a contract, the Employee Services Agreement . . . . And by contract, the agreement states to provide these people with a hearing under TUAPA if they get let go, and that's what happened.

THE COURT: Okay. You assumed the University of Tennessee's duties. They are not a leased employee; they are your employee.

MR. JACKSON: Contractual, which doesn't make you a governmental entity, it just means by contract you agreed to do this.

\* \* \*

MR. JACKSON: We don't give them a name clearing hearing, we just took on contractually this administrative process . . . .

THE COURT: But I'm saying, these were employees of a state agency.

MR. JACKSON: Right.

THE COURT: Then it went private.

MR. JACKSON: Right.

THE COURT: And this employee agreement was entered into to try to give everybody what they wanted basically.

\* \* \*

THE COURT: Instead of setting up a private [entity] and saying your employment with the state ends today –

-13-

* * *

THE COURT: And you can go work for this private entity if you want to or you can draw unemployment from the state entity.

* * *

THE COURT: They set up this thing –

* * *

THE COURT: – they call a leased employee –

* * *

THE COURT: They can't fulfill the duties of a government by contract. The government has a duty, non-delegable duty to meet its duties. If these were its employees the Court finds by the contract as read it did not – the hospital is not entitled to the protection of a private corporation under this agreement. It has assumed the position and duties of the government. You can't claim yourself one thing and then act like something else.

* * *

THE COURT: . . . The Court finds under the Employee Services Agreement University Health Systems, Inc., a private corporation, has assumed the duties that are only the duties of a governmental entity. If that's a valid contract, then everything University Health Systems did, giving hearings, et cetera, et cetera, in terminating the plaintiff's employment is the action of the government, and the sole and exclusive remedy is through the Board of Claims, not a private lawsuit.

If that contract giving University Health Systems the power to take these actions is not valid because it's not a non-delegable duty – can't delegate the duty . . . then it has assumed the liabilities of those duties and it is liable.

The Court has real trouble understanding how a private entity can be liable as a government, but that's what this contract basically says and she would be the beneficiary of it.

-14-

The Court thinks the contract is void as to the extent it attempts to give University Health Systems, a private entity, the powers and duties of the state of Tennessee as to its employees. To that extent, the Motion for Summary Judgment is granted except for those actions that are not dependent upon governmental action.

I don't think the state can delegate its governmental duties. . . .

Another hearing was held in November 2012, at which time the trial court questioned the constitutionality of Tennessee Code Annotated section 49-9-112(a) on the ground that it constituted an unconstitutional lending of the State's credit. In a discussion with the Assistant Attorney General, the court observed in part as follows:

THE COURT: "[T]he University of Tennessee attempts to transfer its employees to a nongovernmental agency as a loaned serv[ant], with them retaining all of the rights of a university employee, but not being employed by the university.

At the same time after that '99 Agreement, the hospital goes out and it hires people doing basically the same job. So you've got two people, side-by-side, one had been a former university employee who's said to be treated as with all the benefits and rights of the university employee; one said in here who's not a university employee.

* * *

THE COURT: . . . Let's say you have a patient at the hospital. Can they sue the nurse that wheeled them down the road and dumped them out on the street and pushed them out in the chair?

Well, if that person is employed directly by the not-for-profit corporation and never has been a university employee, they can sue that employee individually, correct?

* * *

THE COURT: If that person is a UT . . . "State employee," can they sue them?

* * *

-15-

MS. BRODHAG:  It would be treated as if they were a State employee.

THE COURT:  Where would you sue them?

* * *

MS. BRODHAG:  They would have to go to the Claims Commission.

THE COURT:  All right.  So we have a situation.  How does the public know where to sue you?  How does the State lend its credit to the not-for-profit corporation?

That's what you've done.  Because you've immunized what are now their employees.  How do you do that?  Instead of being able to come to court and sue them as an employee of the not-for-profit corporation, now you say:  You go to the State of Tennessee and the State of Tennessee pays for their sins.  Where they have a co-employee at the same time, working the same job that that's not true for.  How is that not lending the credit [of] the State to a not-for-profit corporation?

* * *

THE COURT:  . . . [I]t all goes back to . . . [i]s that agreement in the statute valid?  Can the State do that?

* * *

THE COURT:  Okay.  Well, let me ask you this:  Does she have a right to a name clearing hearing as an employee of the State of Tennessee under the Civil Rights Act?

MS. BRODHAG:  As far as I understand, she was a UT employee.  She has the same rights as a UT employee –

* * *

MS. BRODHAG: She does not have a right to a Civil Service hearing.  She's not a Civil Servant.  She was a UT employee.

* * *

-16-

THE COURT: . . . [S]he is either employed by a not-for-profit or she's employed by the State. She can't be a mixed metaphor.

* * *

THE COURT: How does someone that is employed by a not-for-profit get all the rights of a State employee? How does she get State benefits?

MS. BRODHAG: She's not employed by the foundation. She's employed by the State of Tennessee.

THE COURT: And does what? Makes money for who?

MS. BRODHAG: There is a lease agreement that addresses how all of that applies.

THE COURT: And so, you have a State employee who has all the rights and benefits who is making his money for a not-for-profit corporation and they keep the money, right?

* * *

THE COURT: [T]he end result is: You have a State employee out here working and getting paid, getting all State benefits; and the results of her work, the value of her work, goes to the use and benefit of a nongovernment . . . employer, correct? . . . [T]he revenue stream does not go to the university. The revenue stream goes to the not-for-profit, correct?

MS. BRODHAG: Yes. Again, it's all addressed in the lease agreement how all that works.

* * *

THE COURT: Her supervisor's not a State employee and they've got no supervision, but she's a State employee being supervised by somebody. Now, does that make sense? . . .

* * *

THE COURT: Well, she doesn't have all the rights of a State employee then.

-17-

Because she cannot sue her supervisor before the Board of Claims.

Any other State employee, working for the State, is being supervised by the State and would make claim and have the Board of Claims against her supervisor; but she doesn't. . . .

* * *

THE COURT: . . . [H]ere we've got someone who's . . . "a State employee" getting all the benefits of a State employee, generating revenue for nonprofits.

Does not – the public wouldn't know who in the world. She's treated one way, and the other employees are treated another. I think that's an illegal exercise of [t]he State power.

* * *

THE COURT: . . . I think this situation is the State lending its credit to a nonprofit corporation because they used employees who have one set of rights. They restrict the rights of the public versus what they do when they have two employees sitting side-by-side, one with one set of rights; the other with the other.

I think that this is unconstitutional, invalid. . . .

Following the July and November 2012 hearings, the trial court ruled that Tennessee Code Annotated section 49-9-112(a) was unconstitutional; Womble's 42 U.S.C. section 1983 claims were dismissed, the remainder of UHS's motion for summary judgment was denied, and the parties were granted permission to seek an interlocutory appeal pursuant to Rule 9 of the Tennessee Rules of Appellate Procedure. We granted interlocutory appeal on February 29, 2013, and ruled that the sole issue on appeal is the constitutionality of Tennessee Code Annotated section 49-9-112.

## II. STANDARD OF REVIEW

Questions regarding a statute present issues of law; as such, they are reviewed de novo with no presumption of the correctness of the trial court's conclusions. *U.S. Bank v. Tenn. Farmers Mut. Ins. Co.,* 277 S.W.3d 381, 386 (Tenn. 2009).

### III. DISCUSSION

### A.

The Tennessee legislature has broad authority to act, with its power limited only by the federal and state constitutions. "[T]he General Assembly may enact any legislation that is not forbidden by the Tennessee or federal constitutions." *The Eye Clinic, P.C. v. Jackson-Madison Cnty. Gen. Hosp.*, 986 S.W.2d 565, 577 (Tenn. Ct. App. 1998). A Tennessee court "may only invalidate a statute when it contravenes either the federal or state constitution." *Planned Parenthood of Middle Tenn. v. Sundquist*, 38 S.W.3d 1, 7 (Tenn. 2000). *See also Bell v. Bank of Nashville*, 7 Tenn. 269, 269-70 (1823).

There is a strong presumption that legislative acts are constitutional. *Bailey v. Cnty. of Shelby*, 188 S.W.3d 539, 543 (Tenn. 2006); *West v. Tenn. Hous. Devel. Agency*, 512 S.W.2d 275, 279 (Tenn. 1974). Statutes are "clothed in a presumption of constitutionality [because] the legislature does not intentionally pass an unconstitutional act." *Vogel v. Wells Fargo Guard Servs.*, 937 S.W.2d 856, 858 (Tenn. 1996) (quoting *Cruz v. Chevrolet Grey Iron Div. of Gen. Motors*, 247 N.W.2d 764, 769 (Mich. 1976)). Any reasonable doubt about whether a statute is constitutional must be resolved in favor of its constitutionality. *Bailey*, 188 S.W.3d at 543. When construing a statute, a court has the "duty to adopt a construction which will sustain a statute and avoid constitutional conflict if any reasonable construction exists that satisfies the requirements of the Constitution." *Planned Parenthood*, 38 S.W.3d at 7 (quoting *Davis-Kidd Booksellers, Inc. v. McWherter*, 806 S.W.2d 520, 529-30 (Tenn. 1993)).

With regard to the Tennessee Constitution, the legislative authority of the State is vested in the General Assembly. Tenn. Constitution, article II, section 3. The constitutional prohibition against delegation of legislative power involves the power to make law, or, the discretion as to what the law should be. *See Lobelville Spec. School Dist. v. McCanless*, 214 Tenn. 460 (Tenn. 1964). On the other hand, "any power not legislative in character which the legislature may exercise it may delegate, and before a court can properly hold that a statute is void as unconstitutionally delegating legislative power, it must clearly appear that the power in question is purely legislative." *State ex rel. Llewellyn v. Knox Cnty.*, 54 S.W.2d 973, 976 (Tenn. 1932) (citation and quotations omitted). The Tennessee Supreme Court observed what authority is legislative in *State ex rel. Llewellyn*: "The true distinction . . . is between the delegation of power to make the law, which necessarily involves discretion as to what it shall be, and conferring authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done; to the latter no valid objection

can be made." *Id*. (quoting *Field v. Clark*, 143 U.S. 649,700, 12 S.Ct. 495, 505 (1892)). *See also Dept. of Pub. Welfare v. Nat. Help "U" Ass'n*, 270 S.W.2d 337, 339 (Tenn. 1954); *First Suburban Water Util. Dist. v. McCanless*, 146 S.W.2d 948, 951 (Tenn. 1941). Thus, a delegation of power will not be declared unconstitutional unless it clearly appears that the power delegated is purely legislative.

The State is not constitutionally obligated to operate a hospital – in association with UT or otherwise. Neither the operation of a hospital nor the management of hospital employees is an inherently governmental function so its delegation to a nonprofit corporation cannot amount to an improper delegation of governmental authority. *See* David M. Lawrence, "Private Exercise of Governmental Power," 61 Ind. L.J. 647, 648 (1986) ("We do recognize certain powers as essentially governmental," and it is the delegation of these powers to private actors that prompts the question whether they were delegated improperly). There are no provisions in the Tennessee or federal constitutions that require the State to operate a hospital. Having provided for the operation of a hospital and hiring employees to staff it, the State may not by contract evade any constitutional duties that exist as to those employees. In Tennessee Code Annotated section 49-9-112, the legislature specifically authorized the transfer of administrative and financial responsibilities relative to the leased UT Hospital Employees to UHS. The delegated authority is not purely legislative. The State has no constitutional duty to provide any particular form or level of benefits to the UT Hospital Employees[5] and we know of no provisions of the state or federal constitutions that preclude the transfer of such administrative or financial responsibilities. Therefore, the action by the legislature is permissible. *See The Eye Clinic, P.C.*, 986 S.W.2d at 577.

Instead of presuming that the statute was constitutional, the trial court substituted its judgment for that of the General Assembly. Primarily, it is for the legislature to determine the public policy of Tennessee. *Crawford v. Buckner*, 839 S.W.2d 754, 759 (Tenn. 1992). In the matter of UT Hospital, the General Assembly determined that it was in the best interest of the State to transfer operation of the facility to UHS and "to take action to provide for continued support of the education and research missions of the university."[6] *See* Tenn. Code Ann. § 49-9-1301(a)(3). To assist in accomplishing this purpose, the legislature also deemed it proper to allow the UT Hospital Employees to be leased to UHS. *See* Tenn. Code Ann. §

---

[5]Absent an express contract, a university employee in Tennessee does not have a property interest in employment. *Woolsey v. Hunt*, 932 F.2d 555, 564-65 (6th Cir. 1991) (UT secretary). Further, Tennessee Code Annotated section 8-30-101(23)(H) exempts UT employees from the definition of employees employed in state service.

[6]The availability of special expertise and the fact that it may be substantially cheaper for government to delegate power to private actors than to undertake an activity itself are prime reasons for private delegation decisions. Lawrence, 61 Ind. L. J. at 656-57.

49-9-112(a). The statute does not confer purely legislative authority on UHS. Rather, it provides that UHS must administer certain policies and procedures when supervising and managing UT Hospital Employees and that UHS must pay for the individuals to receive the same wages and benefits as other UT workers. Such a delegation of administrative responsibility is well within the legislature's discretion. *Llewellyn ex rel. State,* 54 S.W.2d at 976. Any concern that the termination of UT Hospital Employees will be affected by private interest is dispelled by the fact that UHS is a nonprofit corporation and the UT Hospital Employees retain their rights to pre- and post-termination proceedings pursuant to the UT Policies and Procedures. *See* Lawrence, 61 Ind. L. J. at 661 ("[I]f a delegation . . . does include protection against the domination of private interest, no deprivation without due process will have occurred."). We find that the statute does not unconstitutionally delegate legislative authority.

## B.

Article II, section 31 of the Tennessee Constitution provides: "The credit of this State shall not be hereafter loaned or given in aid of any person, association, company, corporation or municipality; nor shall the State become the owner in whole or in part of any bank or a stockholder with others in any association, company, corporation or municipality." Case law of this State reveals that the term "credit" as used above refers "to obligations due and to become due." *Ragsdale v. City of Memphis*, 70 S.W.3d 56, 68 (Tenn. Ct. App. 2001). Tennessee Code Annotated section 49-9-1301(b)(1), the statute that allowed for the creation of UHS, denotes as follows:

> (b)(1) Debts or other obligations of a corporation created under this section shall be payable only from assets of the corporation and shall not be debts or obligations of the state. Neither the university nor the state shall have any legal or other obligation to finance the deficits of, or provide financial support to, the corporation. Effective on the date of transfer of operation of the hospital to a corporation created under this section, neither the state nor the university shall have any legal, financial or other responsibility or liability for the operation of the hospital or the corporation.

Tenn. Code Ann. § 49-9-1301 (b)(1). Accordingly, the legislature clearly has not extended the credit of the State to UHS. Further, the ESA specifically provides that all costs for the UT Hospital Employees are assumed by UHS and the State assumes no obligation for those costs. There is no loan or extension of credit by the State.

Furthermore, as noted by the Attorney General and UHS, not every extension of the

State's credit would be unconstitutional:

> The obvious purpose of [Section 31] of our Constitution was to prevent the State from using its credit as a gratuity or donation to any person, corporation, or municipality. It is further obvious that it was not designed to prevent the State from using its credit to aid persons, corporations, or municipalities *if required to accomplish a State or public purpose*, or to fulfill a State duty or obligation under its police power. Under the authorization, the Legislature and not the courts is the exclusive judge of the manner, means, agencies and methods to meet and fulfill these purposes.

*West*, 512 S.W.2d at 283-84 (emphasis added).

The legislation before us clearly meets the public purpose test; it promotes the public purpose of ensuring the maintenance and delivery of quality health care to a large geographical area of Tennessee. *See Bedford Cnty. Hosp. v. Browning*, 225 S.W.2d 41, 43 (Tenn. 1949) (providing hospital facilities is a public purpose). Tennessee citizens in the East Tennessee region have benefitted by this lease arrangement because UHS has maintained continuity in the operation of UT Hospital and provided the services of competent medical professionals, all in keeping with the purpose of the statute creating UHS: "to operate the University of Tennessee Memorial Research Center and hospital in a manner that will fulfill the hospital's mission statement of dedication to its continuation as the premier center to offer medical care to the underserved population of the thirteen county area served by the hospital." Tenn. Code Ann. § 49-9-1301(a)(1). Additionally, the UT Hospital Employees who have lived and worked under this lease agreement are invested heavily in their State benefits and retirement accounts.

Where the legislature determines that an entity's activities serve a public purpose, the courts do not second guess that judgment. "Courts are not authorized to consider whether legislation is unwise or inequitable; thus, we cannot consider the wisdom or necessity of the legislature's policy decisions." *Ragsdale*, 70 S.W.3d at 71-72.

## IV. CONCLUSION

We reverse the ruling of the trial court that Tennessee Code Annotated section 49-9-112 is unconstitutional and that the ESA contract is invalid, vacate the order dismissing certain claims, and remand this matter to the trial court with the instruction to reconsider the motion for summary judgment. Costs of the appeal are assessed to appellee, Lisa Womble.

_____
JOHN W. McCLARTY, JUDGE